† FRANKLIN BANK *versus* COOPER, *Executor.*

No action can be maintained against the surety upon a bond given by the cashier of a bank, which purports to secure the bank against *previous delinquencies* of the cashier, if the agents of the bank had knowledge of such default, and it was unknown to the surety, and they *neglected* to inform him, having a reasonable opportunity to do so, before the execution of the bond.

Where the surety in such action claims exemption from any responsibility on account of a *fraudulent concealment* of facts affecting the risk by the agents of the bank, which concealment may be proved by facts and circumstances, no one of which of itself would be sufficient, but when combined with and explained by other evidence might satisfy the jury of its existence, although it should appear in the evidence : —

1st, That the surety did not *call for information,* nor *see* the officers of the bank after he was called upon to sign, and before the delivery of the bond, and the agent of the bank had not *avoided* giving the information.

2d, That the agent had only *omitted* to seek after the surety and *volunteer* unsolicited explanations.

3d, That knowing the defendant was to be the surety, and afterwards receiving his bond, *without seeing him,* when he was near at hand and could readily have been found ; the proof of these facts will not authorize the Court to say to the jury that they overthrow the defence, *as a rule of law.*

A request for certain instructions which cannot be given with legal propriety may be refused, and no exceptions lie because not given in a modified form.

That a party has not been guilty of a fraudulent concealment of facts from another, cannot be assumed *as a rule of law* because the parties had no communication together *verbally* or in *writing.* Other modes of communication are common.

A request for instructions which assumes a ground of defence to the suit which is not taken, may properly be refused.

Thus, a request for an instruction, that defendant is not permitted to avoid his liability by proof that he did not understand the import of the bond,

unless he was induced by plaintiffs or their agents to suppose it was differ-ent from what it really was, may be refused, when the defence is, not that he did not know the import of the bond, but that facts material to the risk were concealed from him.

Declarations of the officers of a bank when made to a party transacting busi-ness with them in their official capacity, are admissible in evidence.

But declarations made by the president of a bank, when not acting in his offi-cial capacity, respecting its *past transactions*, are not admissible.

Whether a surety on an executor's bond can be discharged, so as to make him a competent witness for the executor, without notice given by the pro-bate court; *quere.*

ON EXCEPTIONS from *Nisi Prius*, RICE, J., presiding.

DEBT, upon a cashier's bond. The defendant's testator was one of the sureties.

The instrument being lost, its contents were proved by a copy. It was dated Oct. 1, 1847, and with the usual con-ditions in such bonds, contained the following, — *and shall account for all notes, drafts and moneys, drafts, notes and property heretofore intrusted to his hands and possession, as cashier of said bank, since he has held the said office.*

Evidence was produced of the loss of the funds of the bank to a large amount, but prior to the date of the bond.

The bank charter expired Oct. 1st, 1849, but by special Act of June 9, 1849, was authorized to continue its corpo-rate capacity to Oct. 1, 1851, for the purpose of collecting its debts, and the corporation was authorized to choose three trustees, with power to prosecute and defend in the name of the bank any suits at law or equity.

The Act was accepted Oct. 22, 1849, and John Otis, Stephen Young, and Joseph Eaton were chosen trustees by whom this action was prosecuted. Otis was president of the bank in 1847, and continued such to its close and had been one of the directors for many years. Eaton had been one of the directors for some years, up to 1847, and the defendant's testator had likewise held the same office sev-eral years prior to the acceptance of the bond.

The defence was, that facts material to the risk were known to the president and directors of the bank, which

were not known to the testator; which were not communica-
ted to him, but were concealed from him, and that the bond
was obtained by fraud.

Much evidence was introduced tending to prove and also
to disprove that the president and directors had knowledge
before the bond was executed, that the cashier was a de-
faulter.

There was evidence tending to show that the books of
the bank were badly kept; that different firms had largely
overdrawn; that the bonds for two or three years previous
to the one in suit were not found; that the cashier was called
upon to give this one because the others could not be found,
and that he said he would give one to cover the past, and
named the testator as surety.

Hiram Stevens, the cashier, was dead.

The defendant offered Charles Cooper, (testator's son,) as
a witness, who was objected to, as he was a surety on de-
fendant's probate bond, but on the production of a copy of
a petition to the Judge of Probate, and proceedings thereon,
discharging the witness from his liability on the bond, and
also a release from witness to himself, and a release from
the executor to him, the Court allowed him to testify. By
him were also proved certain conversations with Otis, which
were objected to by plaintiffs but admitted.

One conversation testified to was in Washington, in 1850,
when the witness said that he charged him with fraud
and corruption; that he told Otis that his father sent for
Stevens, (the cashier,) while he lay sick, and he heard him,
Stevens, tell him that he did not know the clause was in the
bond when he signed it; that Stevens said the bond that was
intended to be given was accepted; that Otis took it before
it was signed; that the next day Otis came down and handed
him another bond which he supposed was the same one which
had been agreed to, and asked him to run over and get father
and his brothers to sign it, and he would wait for him. He
told him of his father's astonishment and suspicion at the

retrospective clause, and that it was the basest fraud, and the witness did not recollect that Otis made any reply.

Another conversation testified to by this witness was in the spring of 1848, at the Franklin Bank, when he went to settle his father's account. At that time witness had not seen the bond; asked Otis the condition of the bank and he said all would come out right, provided the overdrafts should be made good. If the overdrafts of W. & H. Stevens could be secured the defalcation would be made up; he said my father was on the bond, and if he would indorse this paper it would save all trouble upon the bond, and his object was to induce me to get my father to indorse it. I reminded him that my father would not be liable on the bond as it was given after the defalcation; he said father was a friend to Stevens, but made no other remark.

The next conversation testified to by this witness, was in July or August, 1849. "I met Otis in the street; there had a talk about bond and reference; called on him for a copy; told him I had found a retrospective clause, and that I was astonished at it; charged him with obtaining the bond by fraud; told him my father said he did not know there was such a clause in the bond when he signed it, and it was a fraud on him; asked him how he could reconcile it to his conscience to trap him into signing the bond; said he did not think he had done my father wrong; he had been on the bond in previous years, and they had neglected to take bonds three or four years, and father would have undoubtedly signed them if asked; he expressed some doubt about the validity of the bond; said father's estate would never be troubled; it was an offence in Stevens, and they could send him to the state prison at any time."

Eaton and Young were called as witnesses by plaintiffs, who testified that the defalcation of the cashier, or any deficiency in the bank, was unknown to them or to the directors so far as they knew, until after this bond was given.

The evidence introduced bearing directly or remotely upon the grounds taken in defence was voluminous, and will

readily be apprehended by the instructions given and requested at the trial.

The jury were instructed that if at the time the bond was executed the cashier was a defaulter to the bank, and that fact was known to the president and directors of the bank, and by them concealed from defendant's testator, such concealment would be a fraud upon him, and would vitiate the bond; or, if the cashier was a defaulter at that time, and that fact was unknown to the defendant's testator, but was known to the president and directors of the bank, and they neglected to apprise him of that fact, they having a reasonable opportunity to do so before he executed the bond, such neglect would be a fraud upon the testator, and would vitiate the bond so far as he was concerned.

*That* if they were satisfied that defendant's testator was a man of business, and well able to read the bond signed by him, it is a legal presumption that he knew and understood all the provisions therein contained; *that* James N. Cooper, (the testator,) being a director of the bank, it was his duty to know the condition of the books of the bank; *that* as a director he had the opportunity to know, and the law presumes he did know their condition, and that having sworn in their semi-annual returns to the Secretary of State, as to the state of the books, the law presumes he had such knowledge; *that* it must be a knowledge of an actual deficiency, of facts material to the risk, and not the mere irregularity or want of posting up or keeping the books, the concealment of which would constitute a fraud — it must be *knowledge,* not *conjectural fears; that* the inquiry was not what witnesses understood or represented Otis to say; but the fact, did the directors know of the defalcation.

The plaintiffs' counsel requested the following instructions, viz: —

(The 1st and 2d are omitted as they were not relied upon.)

3d. If the jury believe that John Otis, president of the bank, had no communication with said James, verbally or in writing, touching his signing said bond before his signing

the same, there is no ground for any presumption that said James N. Cooper was deceived or imposed upon by said Otis in obtaining his signature.

4th. If the jury believe the testimony of Joseph Eaton and Stephen Young, that the fact of the defalcation of said cashier, or the deficiency of the assets of said bank was unknown to them, or to the directors of said bank, or any of them, until long after the signing of said bond, defendant, in that case, can make no legal defence to plaintiffs' recovering upon the same, although a defalcation or deficiency then actually existed.

5th. There is no evidence in this case, proving or tending to prove that the president, or any of the directors knew of a defalcation, or of a deficiency of the assets of said bank, prior to the execution of said bond of the first of October, 1847.

6th. That as Mr. Cooper did not call on Mr. Otis for information, nor see him after it was proposed by the cashier to procure his, (Cooper's,) signature to the bond until he did sign it, and as there is not evidence of Otis having avoided giving any information he had, there was not such opportunity for communicating information as that the want of doing it would constitute a fraud on said Cooper.

7th. That if the jury believe the testimony of Mr. Young, that the cashier, Stevens, proposed to procure, and knew the bond he was expected to procure, was to cover past years, Mr. Otis had a right to presume, that Stevens would not conceal its character from his sureties; and his, (Stevens') concealment, if such were the fact, would not be a fraud on the part of plaintiffs.

8th. The omission to seek after and volunteer unsolicited explanations, under the circumstances, (if such they are found to be,) is not such fraudulent concealment as to vitiate the bond.

9th. Unless Cooper, when he executed the bond, was induced by the misconduct of the plaintiffs or their agent, to suppose the bond was different from what it really was, he

is not permitted to avoid his liability by proof, that he did not understand the import of the bond.

The Judge refused to give any of these requested instructions. A verdict was returned for defendant.

The plaintiffs filed exceptions to the rulings, the instructions and the refusals to instruct.

*J. W. Bradbury* and *H. W. Paine,* in support of the exceptions, argued 1st, that Charles Cooper was not a *competent* witness. When he was discharged it was done in probate court without notice. *Chase* v. *Hathaway,* 18 Mass. 222; *Breed* v. *Pratt,* 18 Pick. 115. Such a proceeding destroyed the right of appeal provided for in c. 105, § 25, R. S.

2. That the testimony as to conversations with Otis was improperly received. Otis was then but a director, and it does not appear he was employed about the business of the bank. He was doing no act. It was at most but a conversation between the witness and director about a past transaction. *Polley* v. *Ocean Ins. Co.* 14 Maine, 141; *Hartford Bank* v. *Hart,* 3 Day, 491; *McGill* v. *Ransford,* 4 S. & R. 317.

3. The conversation in July, 1849, was not admissible. Otis was not trustee till the fall of 1849. Otis was then in the street, and there is no pretence he was doing any act in his official capacity. This testimony was calculated to prejudice the jury.

4. The third request should have been complied with. The jury were to inquire whether there was a concealment, or if there may have been an omission to state facts proper to be known as to the first breach, they should have been told there could be no concealment, if the parties did not come directly or indirectly together, and there was not the slightest evidence they ever did.

The counsel further argued that the 6th, 8th and 9th requests should have been complied with.

*Evans, contra.* Cooper was a competent witness, having been discharged from the executor's bond, and mutual re-

leases between him and the executor having been given. The statute requires no notice to be given. *Dunham* v. *Branch*, 5 Cush. 560; *Ford* v. *Ford*, 17 Pick. 418; *Bryant* v. *Turner*, 13 Mass. 391. When wanted as a witness surety may be discharged. c. 113, § 20, R. S.

2. The testimony was admissible. The trustees were appointed before the Act, which afterwards ratified rather than gave them their authority. The directors supposed themselves possessed of the required power, and the trustees performed the same duties before and since said act.

3. The requested instructions were properly withheld. The first three, with the fifth and sixth, called upon the Court to decide as matters of law, what was plainly for the jury as matter of fact. 1 Greenl. Ev. § § 44, 48 inclusive.

The fourth was substantially given in chief. It forms no ground of exceptions that the instructions are not given in any precise form, provided those proper for the case are given in any form. *Walcot* v. *Keith*, 2 Foster, N. H. 196.

The seventh was properly refused. The character of the bond was not the turning point in the case. The eighth assumes a ground of defence not taken by defendant, and as to the ninth, the defence was not put upon the ground that defendant's testator did not understand the import of the bond.

If the result of the whole charge is correct, though there may be errors in some particulars, there is no ground for a new trial. *Gibson* v. *Stevens*, 7 N. H. 352; *Lyman* v. *Redman*, 23 Maine, 289; *Brown* v. *Osgood*, 25 Maine, 525.

*Paine*, in reply. Although the statute does not require notice to discharge the surety, yet the common law does, according to the authorities cited.

The vote appointing trustees was not until Oct. 1849; the conversation testified to was prior to that time. But I deny they were trustees in any sense to authorize their declaration to be given in evidence, until made such by the Act of 1849. They were appointed by the directors as a commit-

tee, but that vote had no effect to vest in them the property of the bank, as was done by the Act.

TENNEY, J. — When this case went to the jury it was upon a bond given by the cashier of the bank, and the defendant's testator as one of his sureties. Among other duties required of the cashier, in the condition of the bond, was, " and shall account for all notes, drafts and moneys, drafts, notes and property, heretofore intrusted to his hands and possession as cashier of said bank, since he has held said office."

The defence to the action was, that the bond was obtained by fraud. That facts material to the risk were known to the president and directors of the bank, which were not known to the defendant's testator, and which were not communicated to him, but were concealed from him. And evidence was introduced for the purpose of establishing these propositions.

The jury were instructed, that if at the time the bond was given, the cashier was a defaulter, and that fact was unknown to the defendant's testator, but was known to the president and directors of the bank, and they neglected to apprise him of that fact, they having a reasonable opportunity to do so, before he executed the bond, such a neglect would be a fraud upon the testator and would vitiate the bond, so far as he was concerned."

These instructions are well supported by this case as reported in 36 Maine, 179, and no question is made thereon. But exceptions are taken to omissions to give certain instructions, requested by the plaintiffs, some of which are not relied upon; and also to the admission of certain testimony objected to by them.

The requests, numbered six, seven and eight for instructions, were, that fraudulent concealment would be negatived, by the finding of certain other facts, stated in the requests. The fraud alleged, was of that character, which might be shown by facts and circumstances, no one of which was

Franklin Bank *v.* Cooper.

suited to prove it without further evidence, but altogether might clearly satisfy the jury of its existence, when little of it was *positive* and *directly* bearing upon the issue.   What influence the facts assumed in the requests might have upon the question of fraudulent concealment, was beyond the power of the Court to state to the jury, as a rule of law.

It was properly submitted to the jury to determine what would constitute a reasonable opportunity for the president and directors of the bank to give the defendant's testator information of the cashier's defaults.   It would have been clearly erroneous in the Judge to have instructed the jury, that there was no fraudulent concealment, because Cooper did not call on Otis for information, nor see him, after it was proposed by the cashier to obtain his signature, even if Otis had not avoided giving the information.   If the president and directors had just ascertained with much labor and research, that the cashier was a defaulter, and Cooper was ignorant thereof, and they had reason to suppose, that he was thus ignorant, no known principle of law, would confine the reasonable opportunity, to that which would be afforded by a call by Cooper for information, upon the president and directors, or to a meeting with them after the cashier had proposed to them to obtain him as a surety.

Neither is it a settled principle of law, that the president and directors of the bank, would be relieved from the imputation of fraudulent concealment, after obtaining the knowledge, that the cashier was a defaulter, which knowledge they had, under such circumstances, that they had no reason to believe the defendant's testator was possessed of merely by the omission to seek after and volunteer unsolicited explanations.

One element in this species of fraud is, that the party charged therewith, has full knowledge of facts, which cause the transaction to be a departue from such, as are expected to occur in the usual course of business of that description, subjecting the other party, only to the ordinary risks attending it; and the latter is not supposed to be under even

a reasonable apprehension of that, of which the other has this perfect information.

Under the circumstances relied upon in defence of this action, if the president and directors were informed by the cashier, that he designed to obtain the name of Cooper upon this bond, and they received it afterwards from the cashier without seeing him, when he was near and could readily be found, the omission to give him the information, that the principal in the bond was a defaulter, so important for him, cannot be treated as an honest transaction, when silence would be a fraudulent concealment, if he executed the bond in their presence. Such distinctions have no basis, and cannot be upheld.

The third requested instruction was, that " if the jury believe that John Otis, president of the bank, had no communication with said James Cooper, verbally or in writing, touching his signing said bond, before signing the same, there is no ground for any presumption that said Cooper was deceived or imposed upon by said Otis, in obtaining his signature." .

It is contended, that as to the first branch of this requested instruction, the jury should have been told that there could be no concealment, if the parties did not directly or indirectly come together; and it is said, there was not the slightest evidence that they ever did.

It is well settled, that if an instruction cannot be given entire with legal propriety, no exception can be taken, because not given in a modified form. If no communication, either verbal or written, had taken place between Otis and Cooper, very important communications may have taken place between them in other modes. And it seems to have been relied upon, that this negotiation between the president and directors and the defendant's testator was through the cashier. At any rate, evidence is introduced, by which it appears that the president was charged with having had an agency in obtaining the signature of Cooper to the bond before its execution by Charles Cooper, and he is repre-

sented as having made no reply to the charge. It was for the jury to judge of the effect of this evidence. This instruction was properly withheld.

The ninth requested instruction was, that " unless Cooper, when he executed the bond, was induced by the misconduct of the plaintiffs or their agent to suppose the bond was different from what it really was, he is not permitted to avoid his liability, by proof that he did not understand the import of the bond."

The jury were instructed, that if the defendant's testator was a man of business, and well able to read the bond which he signed, the law presumed that he knew and understood all the provisions therein contained. And the defence was not that the testator was imposed upon, in signing a bond containing a provision that he knew not of, but as the case finds, that facts material to his risk, unknown to him, but known to the president and directors, were concealed from him.

Again, there was no attempt made, at the trial, to show that Cooper was ignorant of the existence of the retrospective clause in the bond, when he signed it, as an independent fact, and no suggestion made, that such fact could be a defence, if proved. But every thing in the case upon this point is, that Charles Cooper charged the president, after the death of his father, with fraud and corruption; told him his father sent for the cashier, while he lay sick; and that he heard the cashier tell his father, that he did not know the clause was in the bond when he signed it; that the cashier said, that the bond that was intended to be given, was accepted; that the president took it before it was signed; and that the next day he came down and handed him another bond, which he supposed was the same one which had been agreed to, and asked him to run over, and get his father and brother to sign it, and he would wait for him; that he told him of his father's astonishment and surprise at the retrospective clause, and that it was the basest fraud. To this the witness stated, he recollected no reply

from Mr. Otis. In this evidence, the charge was, that there had been a gross fraud in obtaining the signature of the defendant's testator; that charge, and the one, that the testator was ignorant of the retrospective clause, were inseparably connected; if one is to be inferred to be true, from the silence of the party addressed, equally so must the other. There is no foundation, therefore, for the instruction, in the evidence, if the defendant had relied upon the want of knowledge simply, that the retrospective clause was in the bond.

The evidence of the interview between Charles Cooper and the officers of the bank, early in the spring of 1848, which was objected to, appertained to the business of the testator with the bank, and the conversation, which took place, might with propriety be regarded as acts, which were admissible, inasmuch as Charles Cooper went there for the purpose of settling his father's account.

A conversation is also represented by Charles Cooper as having taken place between him and the president of the bank, in the street in Hallowell, in a month or two after the death of the testator, which was on June 17, 1849. They had a talk about the bond and reference; called on Otis for a copy; told him he had found there was a retrospective clause, and that he was astonished at it; charged him with obtaining the bond by fraud; told him his father did not know there was such a clause in the bond when he signed it, and it was a fraud on him; asked him how he could reconcile it to his conscience to trap him into signing the bond. He said he did not think he had done his father wrong; he had been on the bond in previous years, and they had neglected to take bonds three or four years, and his father would, undoubtedly, have signed them if asked; he expressed some doubt about the validity of the bond; said father's estate would never be troubled. This evidence was objected to, but admitted.

At the time of this conversation, the Act of June 9, 1849, authorizing the choice of three trustees, to close up the

affairs of the bank, had not been accepted. The vote of acceptance was on Oct. 22, 1849, when Otis, Eaton and Young were chosen trustees. The declarations or admissions of a director of a bank, respecting its past transactions are inadmissible as testimony. *Polleys* v. *Ocean Ins. Co.*, 2 Shepley, 141.

Was the conversation between the president of the bank and Charles Cooper, in the summer of 1849, respecting past transactions? Part of it was certainly of this character. It is true, the witness called for a copy of the bond, but the call being in the street, several miles from the bank, it is not to be understood, that it was made under the expectation of obtaining it at that time. No attempt was made to adjust the difficulty, but all had reference to what had been done before. The president spoke of having neglected to take bonds of the cashier before, and that the testator would have signed such, had they been presented. These admissions of Otis had a tendency to show a concealment of the fact, that the cashier was a defaulter, and we think they were inadmissible, from Otis as president.

Whether Charles Cooper was a competent witness or not, on account of having been a surety on the defendant's bond as executor and discharged by the Judge of Probate, without having given notice to those interested, is a question which it is not important to decide, inasmuch as upon another ground the case must be sent to another trial; and under the law as it now stands, a surety upon a bond is a competent witness for the principal therein without a discharge.                    *Exceptions sustained.*