# Saint *v.* Wheeler & Wilson Manufacturing Co.

### *Action on Bond, assigning Breaches.*

1. *Bond construed as contract of suretyship, not as guaranty.*—A bond signed jointly by several persons, one of whom had been appointed an agent and collector of a private corporation, by written contract made a part of the bond, reciting that for value received, and in consideration of said contract, they "hereby guarantee to" said corporation "the full and faithful performance of said contract, including all damages which may result to said company from any failure on the part of said S. [collector] to perform any of the provisions of said contract, to the amount of $1,000; hereby waiving any necessity on the part of said company of instituting legal proceedings against said S. before having recourse on us,"—binds the other obligors as sureties for said S., and not as guarantors.

2. *When contract of suretyship becomes binding, and how revoked.* Such contract of suretyship, unlike a guaranty, does not require notice of acceptance, but becomes complete and binding on delivery; and having been delivered, one of the obligors can not afterwards revoke it as to himself, unless the right of revocation is expressly reserved in the writing.

3. *Charge submitting question of law to jury.*—If the court improperly submits to the jury the decision of a question of law, as if it was a question of fact, and the jury decides it as the court should have done, the error is without injury, and constitutes no ground of reversal.

4. *Release of one of several co-obligors.*—The release of one of several co-obligors operates to release the others only to the extent of his aliquot share of the whole liability.

5. *Discharge of surety by change of contract without his consent.*—When a surety binds himself for the faithful discharge by his principal of duties as collecting agent for a private corporation, the subsequent imposition of additional duties on the principal, which, though not within the ordinary duties of such agents, does not in any manner prevent or hinder the performance of his former duties, for a default in the performance of which only the surety is sought to be charged, does not discharge the surety; though done without his consent or knowledge.

6. *Same.*—A change in the contract between the principal and his employer, as to the amount of his compensation, does not discharge the surety, though made without his consent or knowledge, when it appears that the settlement between the parties, on which the default of the principal was ascertained, was based on the original contract; nor is the surety discharged because his principal, by subsequent agreement with the employer, without his knowledge or consent, was

[Saint v. Wheeler & Wilson Manufacturing Co.]

allowed to retain his compensation out of his weekly collections, instead of remitting his collections weekly to his employer, as required by the original contract of employment.

7. *Discharge of surety, by indulgence to principal.*—Mere indulgence granted by the employer (or creditor) to the principal, or an agreement to give him further time to make good a default, if not supported by any new consideration which would make it binding as a contract, does not discharge the surety.

8. *Concealment of principal's dishonesty, or continuance in service after discovery, as discharge of surety.*—If the employer, discovering the dishonesty of the principal during the service, fails to give notice thereof to the surety, and continues the principal in the service, the surety is discharged from liability for subsequent defaults.

9. *Same, where employer is corporation.*—This principle applies to a private corporation, when it is shown that one of its agents, in the discharge of his duties, discovered the defalcation of the principal, failed to give notice thereof to the surety, though he had authority to do so, and continued the principal in the service; and the surety is discharged from liability for subsequent defaults.

APPEAL from the Circuit Court of Colbert.

Tried before the Hon. HENRY C. SPEAKE.

This action was brought by the Wheeler & Wilson Manufacturing Company, a corporation chartered under the laws of Connecticut, against R. F. Saint, A. J. Crossthwaite, C. M. Wright, J. F. Hall, and J. R. Spragins; was commenced on the 9th August, 1888, and was founded on the defendants' written contract under seal, which was dated September 19th, 1887, and in these words: "For value received, and in consideration of the within contract, R. F. Saint, of Leighton, Colbert county, Alabama," and the other defendants, mentioning their names and residences, "hereby guarantee to the Wheler & Wilson Manufacturing Company, its successors or assigns, the full and faithful performance of the foregoing contract, including all damages which may result to the said company from any failure on the part of said R. F. Saint to perform any of the provisions of said agreement, to the amount of $1,000; hereby waiving all necessity on the part of said company of instituting legal proceedings against said R. F. Saint, before having recourse on us; hereby waiving the benefit of all constitutional or statutory homestead or exemption laws now in force; further agreeing to pay plaintiff's attorney's fees, and all costs, should suit be necessary to enforce the collection of this bond. Witness our hands and seals," &c.

This contract, or bond, was written on the back of the contract therein referred to, by which said company, as party of the first part, employed said Saint, party of the second part, as its collector, which contract contained these provisions: "*Section* 1. The party of the first part agrees

[Saint v. Wheeler & Wilson Manufacturing Co.]

to employ the party of the second part as its collector. *Section* 2. The party of the second part is to engage in no other business, but to devote his time exclusively to collecting claims given him from time to time by the party of the first part. *Section* 3. The party of the second part agrees to remit to the party of the first part, on Saturday of each week, the full amount of all collections made by him. *Section* 4. All notes, leases and cash received by the party of the second part, on account of the party of the first part, shall he held and rendered strictly as the property of the said party of the first part, subject to their order and under their control. *Section* 5. In any matters where the duties of the party of the second part are not herein clearly defined, he shall obey any and all directions or instructions in relation thereto which shall from time to time be given him by the party of the first part. *Section* 6. The party of the second part is to receive, as full compensation for his services under this agreement, a salary of $50.00 per month, and necessary travelling expenses; said salary and expenses to commence when party of second part reaches his territory and work commences; said party of the second part to furnish his own horse, and to go wherever ordered; all loss of time to be deducted. *Section* 7. This agreement may be terminated at the option of either party, in which case the party of the second part agrees to deliver to the party of the first part, at their office in Nashville, all of their property remaining in his possession or under his control, unless otherwise ordered by them in writing."

The complaint assigned, as breaches of the contract sued on, that said Saint had failed to pay over $800, which he had collected under his contract of employment, and defendants had failed to pay the same on demand; 2d, that he had received "certain notes, claims and leases," describing them, which were received by him for and on account of the plaintiff, and which he had failed and refused to deliver or account for.

The defendants jointly pleaded "the general issue, in short by consent, with leave to give in evidence any matter that would be competent if specially pleaded." They also filed a special plea, alleging that plaintiff was a foreign corporation, and had not complied with constitutional and statutory provisions regulating its right to do business in this State, and that the contract sued on was signed and executed at Leighton, Colbert county, Alabama. The court sustained a demurrer to this plea. The defendant Crossthwaite filed two special pleas, claiming that he was released and

discharged, (1) because, "after said bond had been executed, and before the same was delivered, he notified plaintiff that he would not remain liable on said bond;" (2) because, "after said bond had been delivered, but before said Saint had entered on the discharge of his duties as collector under said contract, this defendant gave plaintiff written notice that he would not remain a surety on said bond, and demanded that his name be stricken from it, and he believed that this had been done, plaintiff having made no objection to this demand." The other sureties filed special pleas claiming that they were discharged by the release of Crossthwaite. The court sustained demurrers to each of these special pleas, but the same legal questions were presented by charges given and refused. All of the sureties joined in several special pleas, claiming that they were released and discharged from liability, (1) because of several changes made in the contract between the corporation and Saint, without their knowledge or consent, by which his duties were increased, which changes were specified in the pleas, and are stated in substance in the opinion; (2) by indulgence granted to Saint, from time to time, without their knowledge or consent, instead of requiring him to pay over his collections at the stated times specified in the contract; and (3) by the continuance of Saint in the service, and placing notes and accounts in his hands for collection, after plaintiff had discovered a defalcation on his part, and without notifying the sureties of such defalcation. Demurrers were sustained to some of these pleas, and issue was joined on the others; but the same legal questions, in substance, were presented by charges given and refused.

The bill of exceptions purports to set out "all the evidence bearing on the questions raised to which exceptions were reserved," but it is unnecessary to state it, or the portions of it to which exceptions were reserved. On this evidence, the court gave a charge to the jury, to portions of which exceptions were reserved by the defendants, as follows: (1) "If the jury find that Saint, as a part of his collections, lifted sewing-machines and sold them, then he would be responsible for the proceeds arising from the sales of such machines, as a part of such collections. This principle applies to Saint; and so far as he is concerned, the verdict of the jury must be against him, for the amount collected, and remitted or accounted for, with interest." (2.) "When plaintiff introduces in evidence the written guaranty sued on, and further shows by proof the amount of Saint's default, then plaintiff is entitled to recover of his

.sureties the same sum it would be entitled to recover of Saint, unless they show by proof that they are not liable therefor." (3,) "If, however, the jury believe from the evidence that the guaranty was delivered to plaintiff before they had any notice of the withdrawal of his name by Crossthwaite, and further that Crossthwaite did withdraw his name from the guaranty, then the other sureties are not[?] discharged, only to the extent that Crossthwaite's share of the default as a surety would be."

The defendants requested charges in writing, numbered from 4 to 24, and excepted to their refusal, as follows:

(4.) "Under the contract between plaintiff and Saint, said Saint was to remit to plaintiff, on Saturday of each week, the full amount of all collections made by him; and his sureties, Hall, Wright, Crossthwaite and Spragins, had the right to insist on that part of the contract; and if the jury believe from the evidence that plaintiff and Saint changed that part of the contract, and plaintiff agreed for Saint to retain from his collections the amount of his salary and expenses, this was a change of the contract, and plaintiff can not recover against the sureties in this suit."

(5.) "If the jury believe from the evidence that, in February, 1888, Saint had only used $50 or $60 of the plaintiff's money, and that he notified plaintiff he was short that amount, then it was plaintiff's duty to notify the sureties, Wright, Crossthwaite, Hall and Spragins; and if plaintiff failed to notify them of such fact, plaintiff can not recover against these sureties for any defalcation of Saint after that time."

(6.) "If the jury believe from the evidence that Crossthwaite was released from the bond after it was signed by the other sureties, and such release was made or consented to by plaintiff, and plaintiff did not notify the other sureties of such release, then I charge you that the plaintiff can not recover in this action against any of the sureties."

(7.) "If the jury believe from the evidence that Crossthwaite was released from the bond or guaranty after the other sureties, Wright, Hall and Spragins, had signed it, then such release was a material change in the contract; and if you further believe from the evidence that such change was made without the knowledge and consent of Wright, Hall and Spragins, then the plaintiff can not recover against them."

(8.) "If the jury believe from the evidence that Crossthwaite was released from the bond or guaranty by the plaintiff, after Wright, Hall and Spragins had signed the bond, and without their knowledge and consent, then the plaintiff

can not recover against the sureties, Crossthwaite, Wright, Hall and Spragins, and they should so find."

(9.) "If the jury believe from the evidence that in February, 1888, the plaintiff had notice that defendant Saint had collected money for it which he had converted to his own use, then it was the duty of the plaintiff to notify Wright, Hall, Crossthwaite and Spragins, his sureties, and if it failed to notify them, the plaintiff can not revover against said sureties for money collected and appropriated to his own use after that time."

(10.) "If the jury believe from the evidence that the plaintiff and defendant Saint materially changed the orig- .inal contract, after the execution by the sureties of the bond sued on, without the consent of the sureties, then the plain- tiff can not recover against the sureties, Wright, Cross- thwaite, Hall and Spragins."

(11.) "If the jury believe from the evidence that the plain- tiff and defendant Saint changed the contract, after the de- fendants Wright, Crossthwaite, Hall and Spragins had signed the bond, and that by such change additional duties were demanded and required of Saint, and that such duties increased the liability of the sureties ; then plaintiff can not recover against them."

(12.) "Under the contract between plaintiff and R. F. Saint, said Saint was to remit to the plaintiff, on Saturday of each week, the full amount of all collections made by him ; and I charge you that Hall, Wright, Crossthwaite and Spragins had the right to insist on that part of the contract, as well as the other parts of the contract ; and if you believe from the evidence that the plaintiff and Saint changed that part of the contract, so as to materially affect the liability of the said sureties, then the plaintiff can not recover in this suit against said Wright, Crossthwaite, Hall and Spragins, and you should so find."

(13.) "Wright, Hall, Crossthwaite and Spragins are sureties of the defendant Saint, and are sued as such. The contract of surety imports entire good faith and confidence between the parties in regard to the whole transaction ; and if the plaintiff knew of any fact or circumstance which was calculated to affect materially the liability of the sureties, it was its duty to notify the sureties ; and if you believe from the evidence that the plaintiff knew of such facts, and failed to communicate it to the sureties, the plaintiff can not recover for any defalcation of Saint after it came in posses- sion of such facts."

(14) "Under the contract between R. F. Saint and the

[Saint v. Wheeler & Wilson Manufacturing Co.]

Wheeler & Wilson Manufacturing Company, Saint was employed as a collector for the plaintiff, and was to engage in no other business for plaintiff, but to devote his time exclusively to collecting claims given him by the plaintiff. Now, if the jury believe from the evidence that, after this contract had been made, and the bond sued on in this case had been executed, R. F. Saint, under the instructions of the plaintiff, sold sewing-machines for the plaintiff, and that this was done without the knowledge or consent of the guarantors on said bond, and that such other duties increased the sureties' risk, and that it was done without their knowledge or consent, then you must find a verdict in favor of the defendants C. M. Wright, A. J. Crossthwaite, J. F. Hall and James R. Spragins."

(15.) "If the jury believe from the evidence that the plaintiff and Saint altered and changed the contract, and the defendant Saint was authorized to sell and discount notes which the plaintiff had put in his hands under said contract, and such change was made without the consent of the sureties, then the plaintiff can not recover against Wright, Crossthwaite, Hall and Spragins, and they shall so find."

(16.) "Any material change in the contract between Saint and the plaintiff, without the sureties' consent, would discharge all of Saint's sureties from liability in this suit, whether such change was beneficial to them or not. The reason of this is, the sureties had the right to rest on the terms of their contract; and if you believe from the evidence there was such change in the contract between Saint and the plaintiff, your verdict should be for the defendants Hall, Wright, Crossthwaite and Spragins."

(17.) "If the jury believe from the evidence that plaintiff, after discovering that Saint had been guilty of converting to his own use money belonging to it, permitted Saint to continue to collect other money, without letting his sureties know such fact, then the plaintiff can not recover for any defalcation of said Saint after such notice to the plaintiff."

(18.) "If the jury believe from the evidence that, after the bond had been executed, A. J. Crossthwaite notified the plaintiff to erase his name from the bond, and that plaintiff received this notice before it had delivered the notes and accounts to Saint for collection, and that plaintiff did not notify the other sureties on the bond that Crossthwaite had withdrawn from the bond; then the plaintiff can not recover against any of the sureties on the bond."

(19.) "If the jury believe from the evidence that the

plaintiff required A. F. Saint to sell sewing-machines and collect the money for such sales, that was a change of the contract, which the defendants C. M. Wright, A. J. Crossthwaite, J. F. Hall and James R. Spragins guaranteed performance of; and if you believe such change in the contract was made without the knowledge or consent of these defendants, the plaintiff can not recover against them in this suit."

(20.) "The contract of suretyship must be strictly construed in favor of the surety. His obligation is voluntary, without any consideration moving to him, without benefit to him, entered into for the accommodation of his principal, and generally also for that of the obligee, and courts see to it that his liabilities thus incurred are not enlarged beyond the strict letter of his undertaking. To the extent, and in the manner, and under the circumstances pointed out in his obligation, he is bound, and no further. His contract can not be changed in any respect; whether the alteration is or is not to his benefit, is not open to inquiry."

(21.) "If the jury believe from the evidence that Saint gave notice to W. W. Walls, agent of plaintiff, that he had collected money, and had not remitted it according to the requirements of his contract with the plaintiff, and that Walls agreed with him that he could settle it with his salary in the future, and that Walls had authority to make this agreement; then that was a change in the contract, and released Saint's sureties."

(22.) "If the jury believe from the evidence that the plaintiff instructed Saint, by letter or otherwise, that he could retain from his collections the amount of his wages and expenses, this was a change of the contract; and if you further believe from the evidence that the change was made without the knowledge or consent of the sureties, Hall, Wright, Crossthwaite and Spragins, your verdict should be for the defendants, Hall, Wright, Crossthwaite and Spragins."

(23.) "If the jury believe from the evidence that, after the bond had been executed and forwarded to the plaintiff, A. J. Crossthwaite notified the plaintiff to erase his name from the bond, and that plaintiff received the notice before Saint had begun work for the plaintiff, and before it had delivered to Saint the notes and accounts for collection, then the plaintiff can not recover against Crossthwaite in this suit, and you must so find."

(24.) "Any material change in the contract between the plaintiff and Saint, after the bond had been executed by the

other defendants, without their knowledge or consent, relieves the defendants Wright, Crossthwaite, Hall and Spragins from liability on the bond, although such change might have been intended for their benefit."

The rulings on the pleadings and evidence, the charges given, and the refusal of the charges asked, are assigned as error.

KIRK & ALMON, for appellants.—(1.) Sureties have the right to stand on the strict letter of their contract, and any alteration of the contract between their principal and the creditor, made without their knowledge and consent, discharges them from further liability, whether the change be injurious to them or not.—City Council v. Hughes, 65 Ala. 201; Wiley v. Hightower, 74 Texas, 306; Plow Co. v. Walmsley, Ind., 11 N. E. Rep. 232; 27 Amer. 404; Brandt on Suretyship, § 121; 1 Brick. Digest, 377, §§ 34-36; 3 Ib. 145, §§ 58-61; 1 Parsons on Contr., 3d ed., 504, note. (2.) While the sureties were discharged by the changes made in the contract without their knowledge or consent, the principal remained bound for his own default notwithstanding the changes.—3 Wait's Actions & Def. 231, § 5; Life Ins. Co. v. Randall, 71 Ala. 220; Railroad Co. v. Brewer, 76 Ala. 135; Anderson v. Bellenger & Ralls, 87 Ala. 334; 31 Am. Rep. 616; 2 Brick. Digest, 374, § 18. Therefore, the second affirmative charge of the court was erroneous. (3.) The release of Crossthwaite discharged the other sureties from liability. Anderson v. Bellenger & Ralls, 87 Ala. 334, and authorities there cited; 69 U. S. 219. (4.) The relation of principal and surety requires the utmost good faith on the part of the principal, and on the part of the creditor; and it was the duty of the creditor, on discovering any dishonesty or defalcation on the part of Saint, at once to notify the sureties of the fact.—Newark v. Stout, 52 N. J. L. 35; 27 Am. Rep. 404; Evans v. Lawton, Amer. Digest, 1888, p. 608, § 22; U. S. Digest, 1890, vol. 5, 1722, § 16; 63 Ala. 424; Brandt, S. & G. § 368; Phillips v. Foxall, L. R. 7 Q. B. 666; 21 Am. Rep. 624.

JAS. JACKSON, and ROULHAC & NATHAN, contra.—(1.) Crossthwaite was not released by his notice to the company that he would no longer be bound. He did not reserve the right to withdraw, and the company did not agree to release him. Calvert v. Gordon, 3 Man. & Ry. 224; 2 Simons, 253; 4 Russ. Eng. Ch. 581; Brandt on Suretyship & Guaranty, 159, § 113. (2.) If Crossthwaite had been released, the other sureties would have only been released thereby, as the court in-

[Saint v. Wheeler & Wilson Manufacturing Co.]

structed the jury, to the extent of his aliquot part of the debt.—Brandt, S. & G. § 383; *Jemison v. Governor*, 47 Ala. 390; *State v. Matson*, 44 Mo. 315; *Schock v. Miller*, 10 Penn. St. 401; *Klingensmith v. Klingensmith*, 31 Penn. St. 460; *Alford v. Baxter*, 36 Vt. 158. (3.) The defendants are sought to be charged for the defalcations of Saint under the terms of the original contract, and none of the alleged changes in the contract affected that liability. (4.) The creditor is not bound to active diligence against the principal, but may forbear the prosecution of his claim, and remain inactive, reposing on the faith of his security.—*McShane v. Howard Bank*, 10 Lawyer's Ann. Rep. 552; *Sasser v. Young*, 6 Gill & J. 247; 37 Md. 502. (5.) The plaintiff was not bound to give notice to the sureties of their principal's default.—*Canal Co, v. Van Vorst*, 21 N. J. L. 100–16; *Railroad Co. v. Schaeffer*, 59 Penn. St. 356–82; *Forrester v. State*, 46 Md. 154. It is the duty of the surety to see that his principal pays. *Watkins v. Worthington*, 2 Bland, 530. (6.) The retention of the principal in the employment by the creditor, after knowledge of a default, does not discharge the surety. *Jones v. United States*, 18 Wall. 662; *Canal Co. v. Van Vorst*, 21 N. J. L. 100; *Railroad Co. v. Schaeffer*, 59 Penn. St. 356.

McCLELLAN, J.—The contract sued on is not a guaranty, but one of suretyship. Crossthwaite and the other defendants, who undertake that Saint shall faithfully perform his contract with the company, are sureties of Saint, and not guarantors. The distinction between the two classes of undertakings is often shadowy, and often not observed by judges and text-writers; but that there is a substantive distinction, involving not infrequently important consequences, is, of course, not to be doubted. It seems to lie in this: that when the sponsors for another assume a primary and direct liability, whether conditional or not in the sense of being immediate or postponed till some subsequent occurrence, to the creditor, they are sureties; but when this responsibility is secondary and collateral to that of the principal, they are guarantors. Or, as otherwise stated, if they undertake to pay money, or do any other act, in the event their principal fails therein, they are sureties; but, if they assume the performance only in the event the principal is unable to perform, they are guarantors. Or, yet another and more concise statement, a surety is one who undertakes to pay if the debtor do not; a guarantor, if the debtor can not; the first is sponsor, absolutely and directly, for the principal's acts, the latter only for the principal's *ability*

to do the act: "the one is the insurer of the debt, the other an insurer of the solvency of the debtor." This is the essential distinction. There is another going as well to its form. The contract of suretyship is the joint and several contract of the principal and surety. "The contract of the guarantor in his own separate undertaking, in which the principal does not join." Indeed, it has been held, pretermitting all other considerations, that no contract joined in by the debtor and another can be one of guaranty on the part of the latter (*McMillan v. Bull's Head Bank*, 32 Ind. 11; s. c., 10 Law Reg., and notes, 435), though we apprehend that a case might be put involving only secondary liability on the sponsors, though the undertaking be signed also by the principal. However that may be, it is certain that in most cases the joint execution of a contract by the principal and another operates to exclude the idea of a guaranty, and that in all cases such fact is an index pointing to suretyship. See Brandt on Suretyship & Guaranty, §§ 1 and 2; 9 Amer. & Eng. Encyc. of Law, p. 68; *Marberger v. Potts*, 4 Harris, 9; *Allan v. Hubert*, 13 Wright, 259; *Reigart v. White*, 2 P. F. Smith, 438; *Kramph's Ex'r v. Hatz's Ex'r*, 2 P. F. Smith, 525; *Birdsoll v. Hencock*, 18 Law. Reg. 751, and notes; *Hartman v. Nat. Bank*, 103 Pa. St. 581; *Courtis v. Dennis*, 7 Metc. (Mass.) 510; *Kearnes v. Montgomery*, 4 W. Va. 29; *Walker v. Forbes*, 25 Ala. 139.

Applying these principles to the bond sued on, the conclusion must be that it is not a guaranty but a suretyship on the part of Crossthwaite, Wright, Hall and Spraggins. It is not their separate undertaking, but the principal also executes it. While they employ the word "guarantee," they directly obligate themselves along with Saint to pay, absolutely and wholly irrespective of Saint's solvency or insolvency, all damages which may result to the obligee from his default. Not only so, but they expressly stipulate that the company need not exhaust its remedies against Saint before proceeding against them. It is, in other words, and in short, a primary undertaking on their part, not secondary and collateral, to pay to the company in the event of Saint's failure, and not an undertaking to pay only in the event of Saint's default *and inability* to pay. They are sureties of Saint, and not his guarantors, and their rights depend upon the law applicable to the former relation, and not upon the law controlling the latter.

2. One of the important differences in the operation, effect and discharge of the two contracts finds illustration in this case. The undertaking of guaranty in a case like this is

[Saint v. Wheeler & Wilson Manufacturing Co.]

primarily an offer, and does not become a binding obligation until it is accepted, and notice of acceptance has been given to the guarantor. Till this has been done, it can not be said that there has been that meeting of the minds of the parties which is essential to all contracts.—*Davis Sewing Machine Co. v. Richards*, 115 U. S. 524; *Walker v. Forbes*, 25 Ala. 139. Being thus a mere offer, it may be recalled, as of course, at any time before notice of acceptance. Indeed, there are authorities which hold that, even after acceptance and notice thereof, the guarantor may revoke it by notice that he will be no longer bound, unless he has received a continuing or independent consideration which he does not renounce, or unless the guarantee has acted upon it in such way as that revocation would be inequitable and to his detriment; and, in cases of continuing guaranty, the effect of such revocation is to confine the guarantor's liability to past transactions.—2 Parsons on Contracts, 30; *Allen v. Kenning*, 9 Bing. 618; *Offord v. Davies*, 12 C. B., N. S. 748; *Tischler v. Hofheimer*, 4 S. E. Rep. 370.

All this is otherwise with respect to the contract of surety. He is bound originally in all respects upon the same footing as the principal. His is not an offer depending for efficacy upon acceptance, but an absolute contract depending for efficacy upon complete execution, and its execution is completed by delivery. From that moment his liability continues until discharged in accordance with stipulations of the instrument, or by some unauthorized act or omission of the obligee violative of his rights under the instrument, or by a valid release. Nothing that he can do outside of the letter of the bond can free him from the duties and liabilities it imposes. He can not assert the right to revoke, unless the right is therein nominated. As was said by the English court, "if he desired to have the right to terminate his suretyship on notice, he should have so specified in his contract."—*Calvert v. Gordon*, 3 Man. & Ry. 124; Brandt Suretyship & Guar., §§ 113, 114.

3. The evidence here as to the release of Crossthwaite tends to show no more than this: that after the bond had been delivered to plaintiff, and after its officers had advised Saint that they were ready for him to enter on the discharge of his duties under the contract secured by the bond, he (C.) requested plaintiff to take his name off the paper. No assent to this request is shown, but only an inquiry on the part of plaintiff as to C.'s reasons for desiring to be released. It would seem that the court itself should have decided that these facts did not release Crossthwaite; but the question

appears to have been submitted to the jury. If this sub-
mission, or any of the instructions accompanying it, was
erroneous, no injury resulted to defendants, since the jury
determined the point against the alleged release, as the court
should have done, assuming it to have been a question of
law. On the other hand, if it were a question for the jury,
it is to be presumed they were properly instructed as to the
rules of law which should guide them to its solution, as no
exceptions were reserved in that regard.

4. The exceptions which were reserved on this part of the
case are to charges given, and to the refusal to give charges
asked by defendants, declaratory of the effect which the
discharge of Crossthwaite, *if the jury found he had been dis-
charged*, would have upon the liability of his co-sureties.
As the jury found expressly that he had not been discharged,
these exceptions present mere abstractions not necessary to
be decided. We have no doubt, however, but that the law
in this respect was correctly declared by the court to be,
that the release of Crossthwaite operated to release the
other sureties only to the extent of his aliquot share of the
liability.—Brandt Sur. & Guar., § 383; Burge on Suretyship,
386; *Klingensmith v. Klingensmith*, 31 Pa. St. 460; *Ex parte
Gifford*, 6 Ves. 805; *Shock v. Midler*, 10 Pa. St. 401; *Currier
v Baker*, 51 N. H. 613; *Governor v. Jemison*, 47 Ala. 390.

5. The sureties of Saint insisted on the trial below
that they were discharged from all liability on the
bond by reason of certain alleged changes made in
the original contract between their principal and the
company by the parties thereto, after they became
sureties for its faithful performance, and without their
knowledge, consent or ratification. It is not pretended that
the paper writing evidencing this contract was ever altered
in any respect, but that its terms were changed by sub-
sequent parol agreements, in the following respects, among
others to be presently considered : *first*, that under this
contract, which constituted Saint a collector only for the
company, he was instructed and required to take up and re-
sell sewing-machines, when he found the notes for the pur-
chase-money of the same, and which were in his hands for
collection, could not be collected ; and, *second*, that he was
authorized to discount or sell the notes placed in his hands
for collection, when the same could not be otherwise re-
alized upon. Nothing is claimed in this action on account
of Saint's misconduct in respect of any property thus taken
up or resold, or of any note discounted by him, or with
respect to the proceeds of any such sale or discount. If

[Saint v. Wheeler & Wilson Manufacturing Co.]

these duties were such as usually devolved upon a collector for a sewing-machine company—as to which there is no evidence in this record, and no necessity for any under the present complaint—it may be that Saint's sureties would be responsible for their faithful performance on his part to the same extent as for money collected on notes in his hands. *Bank v. Zeigler*, 49 Mich. 157. However that may be, the fact that they were imposed upon him, assuming they were not covered by his contract, and hence were in addition to those assumed by the other defendants, can not relieve his sureties from liability with respect to those which were imposed by the contract, unless the imposition of these new duties and their performance by Saint rendered impossible, or materially hindered or impeded, the proper and faithful performance of the service originally undertaken. There is no evidence here that these new and additional duties interfered with the collection of notes placed in his hands for that purpose; nor is any claim made against his sureties on account of any failure to collect such notes. But the *gravamen* of the action is, that he (1) did collect these notes, and converted the proceeds to his own use; or (2) that he failed to deliver such notes to the company on the termination of his employment. We are unable to conceive how the fact that he had other property and funds—machines and the proceeds of discounted notes—in his possession, could have hindered or impeded him in the accounting for funds collected or notes remaining in his hands, or could in any degree have conduced to his conversion of such funds or notes. To the contrary, it would seem, in all reason, that the possession of this other property and these other funds, out of which he might have met the necessities which presumably induced his malversations, would have lessened the chances of misappropriation of the funds and property for which his sureties were responsible, and thus have lessened, instead of increased, their exposure to liability. We are very clear to the conclusion, that the imposition of these new duties not covered by the contract did not discharge the sureties with respect to those embraced in the contract, and as to which no change, in the particulars we we are considering, was attempted.—*City of New York v. Kelly*, 98 N. Y. 467; *State of New York v. Vilas*, 36 N. Y. 459; *Ins. Co. v. Potter*, 4 Mo. App. 494; *Commonwealth v. Homes*, 25 Gratt. (Va.) 771; *Savings Bank v. Trauble*, 42 Am. Rep. 402; *Gaussen v. United States*, 97 U. S. 584; *Jones v. United States*, 18 Wall. 662; *Ryan v. Morton*, 65 Tex. 258; *Nat. Bank v.*

[Saint v. Wheeler & Wilson Manufacturing Co.]

*Gerke*, 6 Am. St. Rep. 453, and note 458; *Bank v. Zeigler*, 49 Mich. 157.

6. The sureties further defended on the ground that the contract between Saint and the company was changed, without their knowledge or assent, by a subsequent parol agreement entered into by their principal and Walls, representing the company, whereby Saint's compensation was to be reduced from fifty dollars per month to nine dollars per week. There was evidence of such agreement, but none that it was supported by a consideration, or that it was approved by plaintiff. And it appears from other evidence that all of Wall's contracts were subject to approval or rejection by other officers ·of the corporation, and that plaintiff settled with Saint on a basis as to compensation of fifty dollars per months. We think, on these facts, this defense is without merit.—*Steele v. Mills*, 68 Iowa, 406.

Equally untenable, in our opinion, is the defense which proceeds on the ground that the instruction of plaintiff to Saint to retain his salary and expenses out of collections made by him was a material change of that provision of the contract which required him to remit ·to the company on the 1st day of each week the amount collected up to that day. The contract provided for Saint's compensation and expenses, but was silent as to the manner of payment. The method of payment thus adopted tended to decrease the risks of·the sureties, as affording less occasion for conversion by Saint than had payments to him been made only at the end of each month.

7. It is well settled, that mere indulgence of the creditor to the principal, the mere forbearance to take steps to enforce a liability upon default, or even an understanding between them looking to payment of the deficit presently due at some time in the future, which does not, for the want of a consideration to support it, or other infirmity, prevent the creditor from immediately demanding payment, will not discharge the surety. Hence, what took place between Walls and Saint in February, 1888, in regard to allowing the latter further time to make good the sum he had theretofore converted, afforded no defense to the sureties with respect to the sum then due.—3 Brick. Dig., p. 715, §§36-43; 9 Amér. & Eng. Encyc. of Law, p. 83, n. 4; *Canal Co. v. Van Vorst*, 21 N. J. L. 100.

8. The sureties, however, on another aspect of the transaction last above referred to between Saint and Walls, predicate a defense going to the amount of their liability. They insist that Saint was at that time ·a defaulter by·em-

bezzlement ; that Walls knew this fact, and, without giving any notice of it to them, he, acting for the company, continued Saint in its employment, and committed other funds to him which were also converted ; and that this action · of Walls discharged them from all liability for funds thus converted after he knew of Saint's dishonesty. The general principle, here relied on, finds abundant support in the authorities. In the leading case of *Phillips v. Foxall,* Law Rep. 7 Q. B. 666, the proposition in thus stated by Quain, J. ; "We think that in .a case of continuing guaranty for the honesty of a servant, if the master discovers that the servant has been guilty of acts of dishonesty in the course of the service to which the guaranty relates, and if, instead of dismissing the servant, as he may do at once and without notice, he chooses to continue in his employ a dishonest servant, without the knowledge and consent of the surety, express or implied, he can not afterwards have recourse to the surety to make good any loss which may arise from the dishonesty of the servant during the subsequent service." And this proposition is rested upon considerations which, to our minds, are eminently satisfactory. Premising that had a default involving dishonesty, and occurring before the surety became bound, been known to the creditor, and concealed by him from the surety, the effect would have been to discharge the surety, a doctrine which' appears to be well established, the court proceeds to declare the same result from a concealment of dishonesty pending a continuing guaranty, as follows : "One of the reasons usually given for the holding that such a concealment [at the time the surety enters into the obligation] would discharge the surety, is, that it is only reasonable to suppose that such a fact, if known to him, would necessarily have influenced his judgment as to whether he would enter into the contract or not ; and in the same manner, it seems to us, equally reasonable to suppose that it never could have entered into the contemplation of the parties that, after the servant's dishonesty in the service had been discovered, the guaranty should continue to apply to his future conduct, when the master chose, for his own purposes, to continue the servant in his employ without the knowledge or assent of the surety. If the obligation of the surety is continuing, we think the obligation of the creditor is equally so, and that the representation and understanding on which the contract was originally founded continue to apply to it during its continuance, and until its termination." The citations directly supporting this conclusion are *quasi dicta*

of Lord Redesdale in *Smith v. Bank of Scotland*, 1 Dow. 287, and of Malins, V. C., in *Burgess v. Eve*, Law Rep., 13 Eq. 450; but the case was subsequently followed in England and the United States, and nowhere abstractly doubted. We follow these authorities, and adopt their conclusions as sound in principle.—*Sanderson v. Aston*, Law Rep. 3 Exch. 73; Brandt on Sur. & Guar., § 368; *Roberts v. Donovan*, 70 Cal. 108; *C. C. & A. R. R. Co. Gow*, 59 Ga. 685; *A. & P. Tel. Co. v. Barnes*, 64 N. Y. 385; *Newark v. Stout*, 52 N. J. L. 35.

9. Indeed, the foregoing doctrine is not controverted in this case; but it is contended that it has no application as between a corporation, being the creditor, and the surety of one of its officers or employes. And there are not a few adjudged cases which support this view. The argument upon which this conclusion is reached is, that "corporations can act only by officers and agents. They do not guarantee to the sureties of one officer the fidelity of the others. The fact that there were other unfaithful officers and agents of the corporation, who knew and connived at his (the principal's) infidelity, ought not in reason, and does not in law or equity, relieve the sureties from their responsibility for him. They undertake that he shall be honest, though all around him are rogues. Were the rule different, by a conspiracy between the officers of a bank, or other moneyed institution, all their sureties might be discharged. It is impossible that a doctrine leading to such consequences can be sound."—*Ft. W. & C. Railway Co. v. Shaeffer*, 59 Pa. St. 356; *Taylor v. Bank of Ky.*, 2 J. J. Marsh. 565; *McShane v. Howard Bank*, 10 Law. An. Rep. 552; Brandt on Sur. & Guar., § 369.

It is to be noted that these cases—and there may be others which follow them—hold, not only that where there is a conspiracy between officers of a corporation to embezzle its funds, the dereliction of neither officer will discharge the sureties of the other, but also where there is a negligent failure on the part of one such officer to give notice to the sureties of another of his dishonesty, and a continuance of the dishonest servant in the corporate service without the assent of his sureties given with a knowledge of the default, the sureties are not discharged from liability for subsequent deficits, though confessedly they would be were the creditor an individual or copartnership. It may be that the first position stated is sound. It would seem to be immaterial whether an original default results from the dishonesty of the principal alone, or conjointly from his

and the dereliction of another corporate employe. The sureties are bound to answer for the results of any form of original dishonesty; that is what they insure against. It may be too, doubtless would be, that no concealment by a conspirator of the fact of the principal's original default, no continuance in the service by an officer of the corporation *in pari delicto* with the principal, would suffice to discharge the surety, since all of this is malversation participated in by the principal, and violative of the contract which the sureties have undertaken to see faithfully performed. Moreover, the acts and omissions of one agent of a corporation, in conspiracy with another to filch their common master, in furtherance of their nefarious purposes, are, in the nature of things, without authorization by implication or otherwise, and can in no just sense be said to be acts or omissions of the corporation. Upon this idea, it may be that where one officer, though not originally participating in the default of another, conceals that default from the sureties of his fellow-officer and from the company, for sinister purposes of his own, and not as representing his employer, or in his interest, and continues the defaulting officer in the service, the sureties would not be discharged as to subsequent deficits. Thus far we may go with the learned courts in which the cases we have cited were decided.

But even our conservatism in following adjudications of courts of acknowledged ability and learning can in no degree constrain us to adopt the second proposition stated above. We can not subscribe to the doctrine, that there is the radical difference insisted on, or any material difference in fact, between the efficacy of acts and omissions of an agent of a creditor corporation, having authority in the premises, on the one hand, and the acts and omissions of the agent of an individual creditor, or of the individual himself, on the other, in respect of condoning the defalcation of an employe, omitting notice to the employe's sureties, and continuing him in the service, to operate a release of the sureties as to subsequent deficits of the dishonest employe. No doctrine of the law is more familiar than that notice to an agent, within the scope of his agency, is notice to the principal; and this doctrine has in no connection been applied more frequently and uniformly than to corporations and their agents. Indeed, there is an absolute necessity in all cases for its application to corporations, since they act and can be dealt with only through agents. Notice to one agent of a corporation, with respect to a matter covered by his agency, must be as efficacious as to its directors or to its

president, since these also are only agents, with larger powers and duties, it is true, but not more fully charged with respect to the particular thing than he whose authority is confined to that one thing. In the case at bar, Walls had authority to make the contract with Saint, subject to the approval of another agent of the corporation. He did in fact make it. This contract contained a provision for its termination by either party at pleasure. The evidence was that Walls had full supervision over Saint, and over all matters embraced in the contract made by Saint. It was at least a fair inference to be drawn by the jury, that he could terminate the employment either under the stipulation in the instrument, or for a violation of it by Saint, subject to the approval of the other officer or agent referred to. There is no ground to doubt but that to have given the sureties notice of Saint's default would have been in the line of his duty and authority. Equally clear it must be, that their assent to him to a continuance of Saint's employment would have bound them for the subsequent defalcation; and, on the other hand, it must be, that their dissent from such continuance communicated to him would have had the same effect as had it been given to any other officer of the creditor company. He had notice of the default. He received it as representing the company. In that capacity, he condoned it, made arrangements with Saint to make it good, continued the employment, and continued Saint's opportunities to embezzle the company's funds, on the supposed security for its re-imbursement afforded by the obligation of the sureties, who had contracted on the assumption of Saint's honesty, and were entitled to know of his dishonesty, when it should develop, as a condition to their subsequent liability. There is no intimation of connivance or conspiracy on the part of Walls with Saint to defraud either the creditor or the sureties. What he did was doubtless done in good faith, and for the interest, as he supposed, of his employer. It was in the line of his employment. If his further duty was to report his action to another officer of the company, the presumption is that he made such a report; there is nothing in the record to rebut such presumption. We can not hesitate to affirm, on this state of the case, that what he did which ought not to have been done, and what he failed to do which ought to have been done, were the acts and omissions of the corporation, involving the same consequences in all respects as if the corporate entity had been capable of direct personal action, so to speak, and had

[Saint v. Wheeler & Wilson Manufacturing Co.]

acted as he did, or as if he himself, and not the Wheeler & Wilson Manufacturing Company, had been the creditor.

We suppose it would not be contended in any quarter that, if these sureties had in terms stipulated that, in case of Saint's default, notice to them and assent on their part should be a condition precedent to their liability for further defaults, they could be held without such notice and assent; and yet, under the doctrine announced in the cases cited, such a stipulation would be entirely nugatory, and the failure of every agent and officer, all with knowledge of the stipulation and of the default, to notify the sureties thereof, would avail them nothing. Yet it would manifestly be no more the duty of the corporation to give a notice so stipulated for than to give a notice made a part of the contract by the law of the land. And such doctrine, carried to its legitimate results, would defeat all corporate liability growing out of the contracts, acts and omissions of agents clothed with power and authority in the premises. That it is unsound is demonstrated not only in logic, but upon analogous authority. As we have seen, the English court in the leading case of *Phillips v. Foxall, supra,* which has never been called in question there or in this country, either as to the result or the reasoning upon which it was reached, supported the principle declared upon the same considerations which underlie the doctrine, that if an employer have knowledge of the previous dishonesty of a servant, and accept a guaranty for his future honesty without disclosing such knowledge to the surety, this is a fraud upon the latter, and he is not bound. Now, suppose an officer of a corporation charged with the duty of finding surety for another officer, knowing of such previous dishonesty on the part of such other officer, takes bond for his faithful and honest performance of the services contracted for without giving the surety notice of the prior dereliction, would not that omission of duty on his part stand upon the same plane before the law, and involve precisely the same consequences, as if the default had occurred after the surety has bound himself, and the officer had then failed to give him notice of it? If the corporation is not prejudiced by the omission in one instance, can it be in the other? If the corporation is responsible for the dereliction of its agent with respect to notice of a previous default, would it not also be responsible for its agent's failure to give notice of the subsequent default? There can, in our opinion, be but one answer to these questions. There can be no possible difference in the duty of the agent

and the corporation's liability for its non-performance in. the two cases. And the law is well settled, that the failure of the agent of a corporation to give notice of such previous dishonesty avoids the obligation of the sureties for future misconduct. Singularly enough, too, some of the cases holding this doctrine distinctly and broadly were decided by courts, those of Pennsylvania and Kentucky, which hold the contrary view as to notice of after-occurring embezzlement.—Brandt on Sur. & Guar., §§ 365–368; Wayne v. Commercial Nat. Bank, 52 Pa. St. 344; Graves v. Lebanon Nat. Bank, 10 Bush (Ky.), 23; Franklin Bank v. Cooper, 36 Me. 179; s. c., 39 Me. 542.

Our conclusion on this point is further supported by the cases of C. C. & A. R. R. Co. v. Gow, and A. & P. Tel. Co. v. Barnes, supra, which, without discussing this point, in effect hold that the omission of an officer of a corporation to notify a surety of the default of his principal in a case like this, and the continuance by such officer of the employment of the principal, will discharge the surety as to all defaults arising during the subsequent service. And in Newark v. Stout, 52 N. J. L. 35, the New Jersey court, while adhering generally to the doctrine we have been criticising, yet held that, if the default and dishonesty of a municipal officer be brought to the attention of the city council, which is clothed with the power to remove him, and he is allowed to continue in the service without notice to and assent on the part of the surety, the latter will be discharged from liability as to all subsequent defaults. It does not appear to have been so considered by that court, but it is manifest that this is a radical departure from the doctrine held by the Pennsylvania, Kentucky, Maryland and other courts, and relied on by appellee here; and goes strongly in support of the contrary rule, which we believe to be the sound one.

It is also to be noticed, that much reliance is had by the courts holding that a surety of one officer of a corporation is not discharged by the acts or omissions of another in the particulars under consideration, on cases decided by the Supreme Court of the United States in respect of sureties of public officers. Indeed, it would seem that this whole doctrine had its inception in this class of cases. This can but be considered an infirmitive circumstance going to the soundness as authority of those cases which involve sureties of corporation officers. There is a palpable and manifest distinction between the two classes of cases bearing directly upon this question, which, while requiring the application of this rule to public officers on the grounds of public policy,

[Scott v. Scruggs.]

and that *laches* should not be imputed to the government, does not require its application to officers of corporations.

We hold that if Walls, while acting for the corporation, and in the capacity of its agent, with respect to the matters and things involved in Saint's contract, received notice of such a conversion of its funds by Saint as amounted to embezzlement, or involved dishonesty, and, without imparting this knowledge to the sureties and receiving their assent thereto, continued him in the service, that the sureties are not liable for Saint's subsequent defaults. Charges 5, 9 and 7, requested for defendants, when referred to the evidence, were correct expositions of the law as we understand in this connection. The refusal of the court to give them involved error which must work a reversal of the case. Most of the other assignments of error are covered by the points considered in the first part of this opinion. Such of the assignments as are not discussed have been considered, and found to be without merit.

The judgment is reversed, and the cause remanded.