974 So.2d 952 (2007)
BARNETT MILLWORKS, INC.
v.
Dennis GUTHRIE.
1060041.
Supreme Court of Alabama.
April 27, 2007.
Rehearing Denied June 22, 2007.
William B. Jackson II of Stokes & Clinton, P.C., Mobile, for appellant.
Finis E. St. John of St. John & St. John, LLC, Cullman, for appellee.
STUART, Justice.
Barnett Millworks, Inc. ("Barnett Millworks"), sued Guthrie & Burke Enterprises, Inc., the owner of The Window and Door Store, and Dennis Guthrie and James Burke, as personal guarantors for debts incurred by The Window & Door Store, seeking to collect amounts owed on purchases made by The Window & Door Store. After a bench trial, the trial court dismissed Guthrie & Burke Enterprises as *953 a defendant and entered the following judgment:
"1. Judgment is entered in favor of [Barnett Millworks] and against Defendant Guthrie for $7,519.41, comprised of principal sum of $4,604.66, interest in the sum of $1,933.96, attorney fee in the sum of $980.79 and costs.
"2. Judgment is entered in favor of [Barnett Millworks] and against Defendant Burke for $78,652.05, comprised of principal sum of $50,138.85, interest in the sum of $20,992.38, attorney fee in the sum of $7,520.82 and costs."
Subsequently, Barnett Millworks filed a motion to alter, amend, or vacate the judgment, arguing that Guthrie & Burke Enterprises and Guthrie, with Burke, should be held jointly liable for the full $78,652.05. After a hearing on the motion, the trial court entered the following on the case action summary:
"ORDERED, after hearing Judgment is hereby entered against Guthrie and Burke Enterprises, Inc., d/b/a The Window and Door Store, in the amount of $78,652.05, comprised of principal sum of $50,138.85, interest sum of $20,992.38 and attorney fees in the sum of $7,520.82. All other requests for relief are denied."
Barnett Millworks appeals, seeking to hold Guthrie personally liable for the full $78,652.05.

Facts
Guthrie was a shareholder and the vice president of Guthrie & Burke Enterprises, Inc., which owned The Window & Door Store. Burke was the president of Guthrie & Burke Enterprises and was in charge of the day-to-day operations of The Window & Door Store. Guthrie had no involvement in the day-to-day business of The Window & Door Store, and he testified that he had no access to the books and records of the store.
Guthrie and Burke signed an agreement with Barnett Millworks on May 16, 1997, personally guarantying payment of future purchases by The Window & Door Store from Barnett Millworks. All invoices for these purchases were sent to The Window & Door Store.
On October 22, 2003, Guthrie spoke in person with a representative from Barnett Millworks, Norman Cox, who was responsible for handling The Window & Door Store account. Guthrie expressed his desire to revoke his personal guaranty of The Window & Door Store's purchases from Barnett Millworks. Cox testified that the policy of Barnett Millworks was to release someone from a personal guaranty only if there are no outstanding charges on the account to which the guaranty is applicable, i.e., only if all current charges are paid, including amounts in the current-order file. Cox testified that at no time did he have authority from Barnett Millworks to actually release Guthrie from the personal guaranty.
Guthrie testified that Cox made a telephone call in his presence to determine the outstanding balance on The Window & Door Store account. Guthrie further testified that Cox stated that the outstanding balance on the account was $11,801.46. Guthrie wrote a check for that amount made out to The Window & Door Store from the account of his personal company, Dennis Guthrie Construction Company. Guthrie gave the check to a secretary at The Window & Door Store and told her to obtain a cashier's check in that amount, which was then given to Cox. Guthrie testified that he made that payment to Barnett Millworks for the sole purpose of being released from the personal guaranty. Barnett Millworks accepted the payment but did nothing to indicate that Guthrie *954 was being released from the personal guaranty. Cox testified that at no time was The Window & Door Store account ever paid in full. Evidence was presented showing that the account balance as of October 31, 2003, was $14,604.66.
Guthrie attempted to revoke his personal guaranty in writing on November 17, 2003, by a letter sent via certified mail to Barnett Millworks. Barnett Millworks received this revocation letter on November 21, 2003. On December 11, 2003, The Window & Door Store made a payment on the account in the amount of $10,000. The policy at Barnett Millworks was to apply all payments to the oldest charges first. On March 2, 2004, over three months after receiving Guthrie's letter attempting to revoke his personal guaranty, Barnett Millworks wrote Guthrie, acknowledging his request to be released from the personal guaranty for The Window & Door Store and agreeing to release him once The Window & Door Store account was current. Barnett Millworks then sought to collect from Guthrie charges made by The Window & Door Store after Guthrie had mailed the written revocation of his personal guaranty to Barnett Millworks. Guthrie made no further payments to Barnett Millworks, and on April 23, 2004, he transferred all of his shares of stock in Guthrie & Burke Enterprises to Burke. It is undisputed that the principal amount that remained due on The Window & Door Store account, as of December 31, 2003, was $50,138.85.
In its order, the trial court does not state its reasons for holding Guthrie personally liable on the account for the principal sum of $4,604.66. It appears that the trial court determined that Guthrie's November 17, 2003, revocation was valid, and that the actual balance of The Window & Door Store account on that date was $14,604.66, which the evidence showed was the amount due on October 31, 2003. The trial court credited the $10,000 payment made by The Window & Door Store in December to the oldest charges first, in accordance with Barnett Millworks' policy, and, thus, reached the figure of $4,604.66 owing at the time Guthrie revoked his personal guaranty.

Standard of Review
"Rules governing the interpretation and construction of contracts are applicable in resolving a question as to the interpretation or construction of a guaranty contract." Government Street Lumber Co. v. AmSouth Bank, N.A., 553 So.2d 68, 75 (Ala.1989). "If the terms within a contract are plain and unambiguous, the construction of the contract and its legal effect become questions of law for the court. . . ." McDonald v. U.S. Die Casting & Dev. Co., 585 So.2d 853, 855 (Ala.1991). Questions of law are reviewed de novo. BT Sec. Corp. v. W.R. Huff Asset Mgmt. Co., 891 So.2d 310, 312 (Ala.2004).

Issue and Analysis
The only issue before this Court is whether Guthrie is personally liable under the personal-guaranty-of-payment agreement for the full amount owed Barnett Millworks by The Window & Door Store. Barnett Millworks contends that Guthrie's attempted revocation of his personal guaranty of payment was ineffective because, it argues, the revocation was not in accordance with the plain language of the guaranty agreement, which Guthrie and Burke signed on May 16, 1997. On the other hand, Guthrie argues that the guaranty agreement constituted only an offer, which could be revoked at any time.
The guaranty agreement reads as follows:
"In order to assure payment to Barnett Millworks, Inc. for purchases made by The Window & Door Store of Cullman. *955 I, James Burke, Dennis Guthrie[[1]] personally guarantee that I or my estate, in the event of my demise, will pay in full all such debts as owed to Barnett Millworks, Inc., by The Window & Door Store, or any other company(s) which I may control. I agree this Guarantee of Payment can only be cancelled with the expressed written consent of Barnett Millworks, Inc."
(Emphasis added.)
The terms of the agreement are plain and unambiguous. The agreement explicitly provides that the guaranty of payment can be canceled only with the express written consent of Barnett Millworks. Therefore, this Court's only task is to decide the legal effect to give this provision. Specifically, this Court must decide whether the provision constitutes a contract that should be enforced according to its terms, or whether the provision is merely part of a continuing offer that the guarantor can revoke at any time.
This Court has not before interpreted a provision in a continuing guaranty agreement that gives the creditor absolute authority to decide when the agreement can be terminated. Conceptually, a continuing guaranty agreement that contemplates a future course of dealings is itself viewed only as an offer to guarantee payment for future specified acts, such as future extensions of credit, and this offer is not accepted until such extensions of credit are made. The parameters of a continuing guaranty are summarized in 38 Am.Jur.2d Guaranty § 60 (1999), as follows:
"An offer for a continuing guaranty is ordinarily effective until revoked by the guarantor or extinguished by some rule of law. As the legal relation between the guarantor and the creditor in a continuing guaranty involves both a contract (as to transactions between the creditor and principal debtor which have been completed) and an offer (as to future transactions between the creditor and principal debtor), the offer to guarantee future obligations may be revoked by the guarantor, at least in the absence of a contrary provision in the guaranty instrument. The result is that the guarantor will not be liable to the creditor on the latter's extension of credit to the debtor subsequent to the receipt of notice of revocation. However, revocation of the continuing guaranty does not affect liability for past transactions which have created a contractual relationship between guarantor and creditor."
(Footnotes omitted.)
Pursuant to this conceptual view of a continuing guaranty agreement, this Court has recognized a guarantor's right to unilaterally revoke an agreement to guarantee the payment of another regarding future acts. For example, in Green v. Southtrust Bank of Sand Mountain, 519 So.2d 1289, 1291 (Ala.1987), this Court stated: "Surely, it goes without saying that the mortgagor's execution of the document as guaranty of future advances does not create an irrevocable encumbrance on the mortgaged property any more than it obligates the mortgagee to advance future loans." See Saint v. Wheeler & Wilson Mfg. Co., 95 Ala. 362, 373, 10 So. 539, 541 (1891) (recognizing that "in cases of continuing guaranty, the effect of such revocation is to confine the guarantor's liability to past transactions"). However, in Green, this Court also explicitly noted that "the method of revocation is not here in issue." Green, 519 So.2d at 1291.
*956 Likewise, the Court of Civil Appeals has recognized as "settled law" the principle that a guaranty agreement "is revocable like other offers." Lightsey v. Orgill Bros. & Co., 454 So.2d 1002, 1005 (Ala.Civ.App. 1984). However, in Lightsey, it appears that the court viewed the part of the agreement concerning the method of revocation as a completed contract because the court examined modification of the method of revocation in terms of offer, acceptance, and mutual assent, as follows:
"It is settled law in Alabama that `[c]ontracting parties are free to modify their contract by mutual assent.' Kinmon v. J.P. King Auction Co., 290 Ala. 323, 276 So.2d 569 (1973). And, since mutual assent is a factual issue, it must be determined by the jury. Cook v. Sweatt, 282 Ala. 177, 209 So.2d 891 (1965).
"The guaranty made by the Lightseys provided that `we hereby personally guarantee the payment of all their [Centreville Building Supply Company, Inc.] obligations to you until withdrawn by us by certified mail.'
"The evidence in the case at bar shows that when Alice and Joe Lightsey sold their interest in Centreville Building Supply they contacted all creditors to notify them of the fact that they were no longer owners and to determine any personal guaranty outstanding. Mrs. Lightsey was told by Stratton-Warren that it would be necessary to advise it of the sale in writing. She wrote a letter to Stratton-Warren informing it of the sale. Shortly thereafter Stratton-Warren required the new owner, Charles D. Lee, to execute a personal guaranty of the debts of Centreville Building Supply.
"Although the written notice to Stratton-Warren did not specifically revoke the Lightseys' guaranty, the fact that Alice and Joe Lightsey informed Stratton-Warren of the sale of their interest in Centreville Building Supply and asked about any outstanding personal guaranty of the debts of the company could be considered by the jury as an offer by the Lightseys to revoke their guaranty. And, when Stratton-Warren told the Lightseys to write a letter advising of the sale of their interest in Centreville Building Supply, the jury could also conclude that Stratton-Warren had agreed to modify the guaranty by accepting written notice of the sale of the Lightseys' interest in that company as a revocation of the Lightseys' guaranty."
454 So.2d at 1005-06 (emphasis added).
It is a firmly established principle that "[i]f a contract is unambiguous on its face, there is no room for construction and it must be enforced as written." Southland Quality Homes, Inc. v. Williams, 781 So.2d 949, 953 (Ala.2000). This Court, like the Court of Civil Appeals, has used this principle to enforce provisions in guaranty agreements that specified a particular method by which the guarantor could revoke his or her agreement to guarantee the payment of another. In Sharer v. Bend Millwork Systems, Inc., 600 So.2d 223, 227 (Ala.1992), this Court held that a shareholder's guaranty of corporate debts required written notice of revocation and, therefore, that the shareholder's selling of his interest in the corporation was insufficient to terminate the guaranty. Also, in Whitfield v. Birmingham Trust & Savings Co., 244 Ala. 526, 530-31, 14 So.2d 137, 140 (1943), this Court examined a guaranty agreement and held as follows:
"[U]nder the terms of the guaranty, no liability of the guarantors arose until loans were made by the bank in its discretion, and no liability existed during the interims between payment of existing loans, and obtaining new ones.

*957 "This in no way prevented the guaranty operating as a standing engagement, a continuing basis of credit, according to the express terms of the guaranty. These express terms included all loans made at any time until the guaranty was terminated by notice in writing, and provided that notes given for indebtedness should be written into and become a part of the guaranty contract. These terms are unequivocal, certain, speak for themselves, leaving no room for construction to a contrary intent. If circumstances attending the giving of the guaranty be considered, they disclose a going business, long existing, and to continue indefinitely, in probable need of seasonal operating capital, for which arrangements were being made, not for the present, not for any specified number of years, but until the guarantors should terminate the credit arrangement evidenced by the guaranty in the manner therein specified."
Therefore, it appears that a provision in a continuing guaranty agreement that requires a particular method of revocation must be given effect as written, even though a continuing personal guaranty of payment itself is considered only an offer and, absent a contrary provision, may be unilaterally revoked by the guarantor so long as notice of the revocation is communicated to the creditor.
In the present case, the guaranty agreement provided only one way to cancel the agreement  with the expressed written consent of Barnett Millworks. It is undisputed that Barnett Millworks never gave such written consent. Therefore, Guthrie's attempted revocation was ineffective, and the terms of the agreement must be enforced as written. Guthrie is personally liable under the guaranty agreement for the principal amount of $50,138.85, plus interest and attorney fees and costs, and the judgment of the trial court insofar as it holds him liable for the principal sum of only $4,604.66, plus interest and attorney fees, must be reversed.
It should be noted that in all previous cases dealing with revocation of a guaranty agreement, the guarantor had complete authority to revoke the agreement, even though he might be obligated to use a particular method of revocation. Here, Guthrie agreed to waive his authority to revoke completely so that revocation could be accomplished only with the express written consent of Barnett Millworks. Such a waiver is enforceable so long as the agreement is in accordance with ordinary principles of contract formation and no contract defenses apply. "`"`"The requisite elements of [a valid contract] include: an offer and an acceptance, consideration, and mutual assent to terms essential to the formation of a contract."'"'" Shewmake v. Estate of Shewmake, 940 So.2d 260, 265 (Ala.2006) (quoting Hunter v. Wilshire Credit Corp., 927 So.2d 810, 813 (Ala.2005) (quoting in turn other authorities)). Here, Guthrie does not argue that the provision concerning cancellation of the guaranty agreement lacked any of these requisite elements of a valid contract, nor does he argue on appeal the applicability of any contract defenses. Therefore, the parties contracted for a particular method of revocation, and the guaranty agreement remains in effect until it is terminated by that method. Guthrie must be held to his personal guaranty of payment because Barnett Millworks never canceled the guaranty agreement by expressly consenting in writing to the termination of the agreement.

Conclusion
Based on the foregoing, the trial court's judgment is reversed, and this case is remanded *958 for proceedings consistent with this opinion.
REVERSED AND REMANDED WITH DIRECTIONS.
SEE, LYONS, WOODALL, BOLIN, and PARKER, JJ., concur.
COBB, C.J., and MURDOCK, J., dissent.
MURDOCK, Justice (dissenting).
I believe the following analysis from the main opinion is dispositive of the present case:
"Conceptually, a continuing guaranty agreement that contemplates a future course of dealings is itself viewed only as an offer to guarantee payment for future specified acts, such as future extensions of credit, and this offer is not accepted until such extensions of credit are made. The parameters of a continuing guaranty are summarized in 38 Am. Jur.2d Guaranty § 60 (1999), as follows:
"`An offer for a continuing guaranty is ordinarily effective until revoked by the guarantor or extinguished by some rule of law. As the legal relation between the guarantor and the creditor in a continuing guaranty involves both a contract (as to transactions between the creditor and principal debtor which have been completed) and an offer (as to future transactions between the creditor and principal debtor), the offer to guarantee future obligations may be revoked by the guarantor, at least in the absence of a contrary provision in the guaranty instrument. The result is that the guarantor will not be liable to the creditor on the latter's extension of credit to the debtor subsequent to the receipt of notice of revocation. However, revocation of the continuing guaranty does not affect liability for past transactions which have created a contractual relationship between guarantor and creditor.'
"(Footnotes omitted.)
"Pursuant to this conceptual view of a continuing guaranty agreement, this Court has recognized a guarantor's right to unilaterally revoke an agreement to guarantee the payment of another regarding future acts. For example, in Green v. Southtrust Bank of Sand Mountain, 519 So.2d 1289, 1291 (Ala. 1987), this Court stated: `Surely, it goes without saying that the mortgagor's execution of the document as guaranty of future advances does not create an irrevocable encumbrance on the mortgaged property any more than it obligates the mortgagee to advance future loans.' See Saint v. Wheeler & Wilson Mfg. Co., 95 Ala. 362, 373, 10 So. 539, 541 (1891) (recognizing that `in cases of continuing guaranty, the effect of such revocation is to confine the guarantor's liability to past transactions')."
974 So.2d at 955-56 (emphasis other than on the word "irrevocable" added).[2]
*959 The rule as described in the foregoing analysis appears to be well-founded in logic and reason, in that once a guarantor gives notice to a creditor that he or she no longer will be obligated for future transactions of the business, the creditor is on notice and cannot take the position that it may make future extensions of credit in reliance on the guaranty. As Guthrie argues, "If the guaranty is revoked, the creditor has the option whether to extend or withhold additional credit without the added security of the personal guaranty." If the rule were otherwise, an individual who guaranteed extensions of credit to his or her business, but who then sold that business to a third party, would be inextricably obligated in perpetuity (as would his estate under contract language such as that found in the present case) to guarantee newly incurred obligations of the business in the hands of the third party, subject only to a discretionary choice by the creditor to terminate that obligation.
Viewed in the context of the above-stated principles, the provision in the guaranty agreement that Guthrie's guaranty of payment "can only be cancelled with the express written consent of Barnett Millworks, Inc." reasonably can be, and should be, construed as merely explaining the method of terminating Guthrie's guaranty obligations as to "transactions between the creditor and principal debtor which have been completed." 38 Am.Jur.2d Guaranty § 60 (1999). This understanding would be consistent with the holding of the Alabama Court of Civil Appeals in Lightsey v. Orgill Brothers & Co., 454 So.2d 1002, 1005 (Ala. Civ.App.1984), quoting 1 A. Corbin, Corbin on Contracts § 38 (1963): "`A promise of guaranty . . . is revocable like other offers. . . . The method of exercising this power [of revocation] varies; usually it is by giving notice to the offeree.'" (Emphasis added.)
COBB, C.J., concurs.
NOTES
[1] This guaranty agreement was apparently a form agreement, containing blanks for the names of the parties, other than Barnett Millworks. One agreement was completed to include both Burke and Guthrie, whose names were inserted in the appropriate blank.
[2] The same analysis is reflected in 38A C.J.S. Guaranty § 40 (1996):

"In the absence of a provision in the contract to the contrary, a guarantor may revoke a continuing guaranty for which the consideration is not executed; but he cannot thereby escape liability for advances which have been made or responsibilities which have been incurred on the strength of the guaranty before notice of revocation is given, nor may he revoke the guaranty where the consideration given therefor is entire and has been executed.
"A promise of guaranty is generally revocable like other offers. Where a guaranty is continuing in form, and the consideration therefor is not executed, unless there is a provision in the guaranty to the contrary, the guarantor may withdraw therefrom at any time and cannot be held for any advances made or liabilities incurred after giving notice of his intention no longer to stand as guarantor, especially where provision has been made therein for withdrawal. . . . The intention to make a continuing guaranty irrevocable must be clearly and unequivocally expressed."
(Footnotes omitted.)