[No. 6451.]

## THE NEWS-TIMES PUBLISHING COMPANY v. DOOLITTLE. ET AL.

CONTRACTS—*Construed*—A corporation publishing certain newspapers leased a carrier's delivery route to the defendant for a term of years, agreeing to deliver to him a number of papers sufficient to supply all subscribers on the route, and the lessee agreeing to deliver them. The lease was in writing. One clause of it provided that on Monday of each week defendant should pay a certain rate for each of the different newspapers. *Held*, an absolute sale of the newspapers, the obligation to pay not depending on the carrier's ability to collect, and this interpretation of the clause in question was *held* to be fortified by other clauses requiring the carrier to investigate for himself, and determine the propriety of accepting subscriptions which might be offered, and that the carrier "shall be charged for the exact number of papers his route calls for." *Held further*, that this result is not qualified by a clause providing that if the agreement should be cancelled the carrier should "repay to the corporation all moneys collected in advance of the day of the cancellation," and that the corporation reserved the right "to collect the moneys theny owing" to the carrier—(388-394).

2. —Guarantor or Surety—A corporation publishing certain newspapers executed to Doolittle a written lease of a certain carrier's route, in several clauses, specifying the obligations and liabilities of each party.

At the foot of the paper, under the title, "Guarantee," was a writing subscribed by Doolittle and two others, whereby it was provided that in consideration of the lease the three subscribers "guarantee and obligate themselves" to the corporation, that Doolittle "shall faithfully perform each and all of the terms of the above contract, and that in case of his failure, the other subscribers, upon demand, and the presentation of an itemized statement, &c., will pay to the corporation "all damages in full," but limiting the liability of the three subscribers, "as sureties under this contract," to a sum specified. Held, that inasmuch as the contract of leasing, and the supplemental undertaking of the three were made at the same time, upon a single consideration, that the latter was executed by Doolittle as well as by the others, that the word surety appears, as well as the word guarantee, that all of the parties subscribed the later agreement, and all thereby obligate themselves, absolutely, to pay at a fixed time, without reference to the solvency of Doolittle, the supplemental agreement must be regarded as one of suretyship, and not of guarantee; that the subscribers were liable severally as well as jointly; and that the failure to serve a statement of the damages upon one of the sureties did not affect the liability of the other—(394-397).

3. MAXIMS—The law does not require unreasonable or impossible things—(398).

*Error to Denver District Court*—Hon. GREELEY W. WHITFORD, Judge.

Mr. HORACE N. HAWKINS and Mr. STEPHEN W. RYAN for plaintiff in error,

Mr. JAMES H. PERSHING and Mr. ARCHIBALD A. LEE for defendants in error.

Mr. JUSTICE HILL delivered the opinion of the court:

This action involves the construction to be given a certain written instrument entered into by the plain-

tiff in error, the defendants in error and one H. A. Barclay. A demurrer was sustained to the complaint; the plaintiff declined to amend. Judgment was rendered in favor of the defendants for costs. The plaintiff brings the case here for review upon error.

The complaint alleges that on the 26th day of November, 1906, a written agreement was entered into by plaintiff with the defendants and one H. A. Barclay. A copy of the agreement is set forth in the complaint. Its substance is, that the first party is the owner of certain newspapers, and leases to the second party a certain carrier's delivery route for a period of two years, and agrees to furnish a sufficient number of newspapers to supply all subscribers on said route; that the second party agrees to deliver the papers to all subscribers within said district, etc.; that he also has the right to surrender this lease at any time, upon first giving thirty days' notice.

The fourth paragraph, the meaning of which is in dispute, reads as follows:

"Fourth: The second party further agrees, on every Monday of each week, to pay the said The News-Times Publishing Company at the rate of 1 2-3 cents per copy for The Daily Rocky Mountain News, 1 1-6 cents per copy for the The Denver Times, and 2 1-2 cents per copy for The Sunday Rocky Mountain News, and he agrees to deliver said paper to all subscribers at the rate of 17 1-2 cents per week for The Rocky Mountain News, 10 cents per week for The Denver Times, and 15 cents per week for the Denver Times and The Sunday Rocky Mountain News."

By the fifth paragraph, the second party agrees to keep an original and duplicate route book containing a list of subscribers, together with all of their payments, which book it is agreed shall be the property of the first party and be turned over to it at any time desired.

The eighth and ninth paragraphs, the meaning of which is in dispute, read:

"Eighth: It is further agreed that delivery will be made by the carrier on all office orders three days before carrier makes any inquiry of the subscribers concerning such office order. That a report must then be made promptly on such order, by the carrier, and if the order is considered good, the carrier will endorse the same 'O. K.,' but if bad, the carrier must state why it is returned as not good. The carrier agrees never to return an order back as N. G., until he has seen the person named in the order, and that he will not accept a statement of some one else.

It is further agreed that all deliveries shall begin on the morning or evening the order is received by the carrier, and that there will be no delay in the carrier making the investigation.

Ninth: It is agreed that the party of the second part shall be charged for the exact number of papers his route calls for, adding all new orders and deducting all stops. If the list does not agree with the orders and stops received at the office or reported by the carrier, it will be corrected, and charge made for the proper number of papers."

The tenth paragraph provides, that the second party will confine his delivery within the limits of said route; that all copies to be delivered free will be ordered by the business office and due credit allowed; that no copy shall be delivered free without such order.

By the eleventh paragraph the second party agrees to observe the regulation subscription rates of the papers, and to use the authorized form of bill or receipt adopted by the first party.

The fourteenth paragraph, the meaning of which is in dispute, reads:

"Fourteenth: It is further agreed that, should this agreement be cancelled for any reason whatever, the party of the second part is to repay to the party of the first part all moneys collected in advance of said date of cancellation, and the party of the first part reserves the right, if it so elects, to collect the moneys then owing the party of the second part and to account for the same without cost to said party of the second part."

It is also agreed that the first party shall have the right, should the second party violate any of the foregoing agreements, to cancel the lease. Then follows the signature of The News-Times Publishing Company, by MacDonald, also that of Henry I. Doolittle. Following these signatures, and as alleged by the complaint as a part of the same instrument, is the following:

"GUARANTEE.

In consideration of The News-Times Publishing Company leasing to H. I. Doolittle Route No. 28 as above set forth, the undersigned, H. I. Doolittle, Agent, and J. Simon and H. A. Barclay, sureties, hereby guarantee and obligate themselves to the said The News-Times Publishing Company that the said H. I. Doolittle shall promptly and faithfully carry out and perform each and all of the terms of the above contract to be by him performed. In the event of the failure upon the part of the said H. I. Doolittle to fulfill each and every obligation of said contract to be fulfilled and performed by him, then we, the undersigned J. Simon and H. A. Barclay, sureties, will immediately and upon demand and the presentation of an itemized statement of damages, pay to the said The News-Times Publishing Company all damages in full that may be sustained by them on account of such failure or neglect of said H. I. Doolittle to fulfill and perform his obligations in the said contract contained. That the liability of the

said H. I. Doolittle, agent, J. Simon and H. A. Barclay, as sureties, under this contract, shall not exceed the sum of One Hundred and Fifty Dollars.

Dated at Denver this 26th day of November, A. D. 1906.

> HENRY I. DOOLITTLE, Agent.
> JOHN SIMON, Surety.
> H. A. BARCLAY, Surety.

Witness: HENRY I. DOOLITTLE."

The complaint then alleges that the plaintiff complied with the contract and furnished Doolittle the papers agreed to be furnished, but that Doolittle did not perform the terms of the contract to be performed by him, in that he purchased of the plaintiff, and there were delivered to him, between the 28th day of July, 1907, and the 11th day of September following, 2,723 copies of The News and 8,108 copies of The Times, for which, under said contract, he agreed to and should have paid the plaintiff $158.30, but upon which he only paid (after allowing all credits) $38.55, leaving a balance of $119.75 due, owing and unpaid the plaintiff. The complaint further alleges, that because of said failure of said Doolittle to comply with said contract, the plaintiff cancelled it and presented to the defendant John Simon an itemized statement of the number of papers delivered to Doolittle under said contract, which statement it is alleged shows the amount due, all payments, itemized damages, and demand from him for the payment of said amount, etc. It was further alleged that the plaintiff had been unable to obtain service of said statement on the said H. A. Barclay because of his having been and now being absent from the state of Colorado.

This presents three questions for determination. First, did the complaint state a cause of action against

the defendant Doolittle? Second, were the signers of his bond sureties for the fulfillment of his contract so that one action could be brought against all, or were they guarantors only to the extent that a separate action would have to be brought against them after plaintiff had exhausted his remedy against the principal? Third, did the failure of the plaintiff to make a demand and serve an itemized statement of its damages upon the singer Barclay, as provided for in the contract, release the obligation of the defendant Simon?

It is contended by the defendants that no breach entitling the plaintiff to cancel its contract is charged in the complaint, in this, that there are no allegations that the defendant Doolittle has failed to turn over any moneys collected; that, per the terms of the contract, Doolittle purchased no papers and was only holding for such moneys as he had collected from the subscribers, including moneys collected in advance, in case of the cancellation of the contract. In other words, that under the contract the plaintiff was not to be paid for its newspapers until the carrier collected it from the respective subscribers.

We find nothing in the contract to support this contention. Paragraph four provided that the carrier was to pay for the papers supplied him at specified prices; that he was to pay for his papers every week. This was an absolute sale of the papers to the carrier; payment was not contingent upon the carrier's ability to collect from the parties to whom the papers were delivered. This position is strengthened by paragraphs eight and nine, wherein it is provided, that orders received for that route from the office should be delivered three days before the carrier makes inquiries of the subscribers concerning such office order; that a report should then be made to the office, if he, the carrier, considered them good, but if bad he would give

his reasons as to why it was returned not good.  The
ninth paragraph provides that the carrier should be
charged for the exact numbers of papers his route calls
for, thus showing conclusively when the paragraphs
are all considered together that the papers were sold
to the carrier who assumed the responsibility of col-
lecting his money from the person to whom he deliv-
ered.  Further, it will be observed that he was not
working upon a salary or commission basis, neither
was provided.  On the other hand, he was to receive
his papers at a certain price, payable at certain stipu-
lated periods.  No provision was made that these pay-
ments were contingent upon his ability to collect from
his patrons.  We do not think these conditions are in
any way qualified by paragraph fourteen, which, as we
read it, was intended to mean that in case of the can-
cellation of the contract, the carrier should repay to
the company all moneys collected in advance of said
date; nor by the clause which provided that the com-
pany, if it so elected, could collect the moneys then
owing to the carrier, provided it cared to do so, with-
out cost to him.  The first clause in paragraph four-
teen tends to sustain our views; it evidently means that
while the contract continues in force the carrier may
collect for subscription in advance, although by the
terms of paragraph four, he need not at that time turn
that money over to the company, but only such as is
necessary to pay for the papers actually received at the
price to be paid by him, but in the event of a cancella-
tion of the contract, then this advance money paid by
subscribers should be accounted for, because he had
given nothing for it and the reputation of the com-
pany would, of necessity, require it to see that the
carrier's contract with the subscriber was fulfilled,
eliminating any question of a legal liability to do so.
The second clause in paragraph fourteen, which pro-
vides that it was entitled to make the collections then

owing to him if it so desired, was simply an additional security or protection in order to receive payment for its papers, but in no way relieved him of his obligation until the company was paid.

As the complaint states a cause of action against Doolittle, what is the nature of the liability of Simon and Barclay? Is it a contract of strict guaranty or contract of suretyship? There is often considerable difficulty in determining the exact difference between contracts of strict guaranty and of suretyship or in harmonizing the conflicting decisions upon the subject.

In Brandt on Suretyship and Guaranty, Vol. 1, (3rd Ed.) Section 2, it is said:

"The words surety and guarantor are often used indiscriminately as synonymous terms; but while a surety and a guarantor have this in common, that they are both bound for another person, yet there are points of difference between them which should be carefully noted. A surety is usually bound with his principal by the same instrument, executed at the same time and on the same consideration. He is an original promisor and debtor from the beginning, and is held ordinarily to know every default of his principal. Usually the surety will not be discharged, either by the mere indulgence of the creditor to the principal, or by want of notice of the default of the principal, no matter how much he may be injured thereby. On the other hand, the contract of the guarantor is his own separate undertaking, in which the principal does not join. It is usually entered into before or after that of the principal, and is often founded on a separate consideration from that supporting the contract of the principal. The original contract of the principal is not the guarantor's contract, and the guarantor is not bound to take notice of its non-performance. The guarantor is often discharged by the mere indulgence of the creditor to the principal, and is usually not liable unless notified of

the default of the principal. 'The rules of the common law as to sureties are not strictly applied to guarantors, but rather the rules of the law merchant, and the true distinction seems to be this: That a surety is in the first instance answerable for the debt for which he makes himself responsible, and his contracts are often specialties, while a guarantor is only liable when default is made by the party whose undertaking is guaranteed, and his agreement is one of simple contract.' The principal and surety, being directly and equally bound, may be sued jointly in the same suit, while the guarantor, being bound by a separate contract and only collaterally liable, can not usually be joined in the same suit with the principal."

In Volume 14, American and English Encyclopedia of Law, (2nd Ed.), page 1130, it is said:

"The contract of a guarantor is a separate contract. The contract is in the nature of a warranty by him that the principal will perform his contract, and not jointly with him that it will be done. He has to answer for the consequences of his principal's default. He is not bound to take notice of non-performance. If the creditor does not give notice of a default and the guarantor is damaged, he is thereby discharged to the amount of the damage. A surety is an insurer of the debt. A guarantor is an insurer of the solvency of the debtor. A surety may be sued as promisor, but a guarantor cannot. A principal and a surety, being equally bound, may be joined in the same suit; but a guarantor, being bound by a separate contract, must be sued separately."

In the case of *Kearnes v. Montgomery*, 4 W. Va. 40, it is said:

"The contract of a guarantor is collateral and secondary. It differs in that respect generally, from the contract of a surety which is direct; and in general the guarantor contracts to pay if, by the use of

due diligence, the debt cannot be made out of the principal debtor, while the surety undertakes directly for the payment, and so is responsible at once if the principal debtor makes default."

In the case of *McMillan and others v. The Bull's Head Bank,* 32 Ind. at page 15, it is said:

"There is no case in the books, to our knowledge, and some pains has been bestowed in their examination, in which one contracting jointly with the principal debtor has been deemed a guarantor and allowed to avail himself of such defenses as are peculiar to that character."

Applying these principles to the instrument sued upon, the conclusion must be that it is not a guaranty, but a suretyship on the part of Simon and Barclay. It is not their separate undertaking made at a different time, and for another consideration other than that coming from the principal, the principal also executes it. It was all done at one time, one consideration and one purpose, and while they employ the word "guaranty" they also use the word "surety." They directly obligate themselves to pay, absolutely and wholly irrespective of Doolittle's solvency or insolvency, all damages which may result to the obligee from his default; not only this, but they expressly stipulate as to the time when they will pay, which is immediately upon demand and presentation of an itemized statement of the damages. The instrument does not state that payment by them is conditional only in case it is not made by Doolittle, nor that it is necessary that the company exhaust its remedies against him before proceeding against them. It is a primary undertaking on their part (not secondary and collateral) to pay to the company in the event of the failure upon the part of Doolittle to fulfill each and every obligation in said contract.

When this instrument is construed as a whole, the only conclusion which we can come to is, that they are sureties of Doolittle, and not his guarantors, and that their rights depend upon the law applicable to the former relation, and not upon the law controlling the latter. Quite similar instruments were under consideration in the following cases.—*Saint v. Wheeler & Wilson Mfg. Co.*, 95 Ala. 362; *Fidelity Mut. Life Ins. Co. v. Stegall*, 111 Pac. (Okla.) 389; *Pulaski Stave Co. v. Miller's Creek Lbr. Co.*, 128 S. W. (Ky.) 96; *Page v. White Sewing Machine Co.*, 12 Tex. Civ. App. 327.

In these cases the signers of the instruments were held as sureties and not guarantors, following the general principle that a surety is usually bound with his principal in one and the same instrument, executed at the same time, and on the same consideration; while on the other hand, the contract of the guarantor generally is his own separate undertaking in which the principal does not join, and is usually based upon some other or different consideration. The defendants being principal and surety, the plaintiff was entitled to include both in one action.

The third contention is, that as the complaint alleges the plaintiff did not make a demand or serve an itemized statement of its damages upon Barclay, the other signer, consequently his liability was not fixed and for the purposes of this suit he was released, and by such failure to give him the required notice of the default of the principal, his co-guarantor Simon was likewise released. We cannot agree with this position. These two signers were sureties and not technically guarantors. They were severally, as well as jointly, liable for the default and could be sued either jointly or severally.—Section 2528, Vol. 2, Mills' Annotated Statutes; section 13, Mills' Annotated Code;

*Fitzgerald v. Burke,* 14 Colo. 559; *Doyle v. Nesting,* 37 Colo. 522.

Neither can we agree with the contention that upon account of the plaintiff's inability to serve Barclay with this demand and notice that he was in any wise released from his obligation, or that there can be gathered from this allegation any intention upon behalf of the plaintiff to release him, or that the prosecution of this suit against the defendant Simon, until the claim was satisfied, would bar the institution of an action against the signer Barclay at any time after service upon him of this demand and itemized statement. The contract did not provide that the sureties would be served with the notice of the principal's default. Under its terms there was a liability existing against them at the time of the default. The question of the notice concerns the time at which they agreed to pay, which was immediately upon the presentation of an itemized statement of the damages. The pleading shows, through no fault of the plaintiff, that it was impossible to get service upon the co-surety and for that reason it was not done; this does not allow the surety served to take advantage of it in order to defeat his obligation, and does not release him therefrom; if so, all that is necessary in such cases to defeat any liability is for one of the co-sureties to leave the country and keep his whereabouts unknown so that service can not be made upon him. The law does not require such unreasonable or impossible things. The court erred in sustaining the demurrer.

For the reasons stated, the judgment is reversed and the cause remanded with instructions to overrule the demurrer and allow the defendants time within which to further plead as they may be advised.

*Reversed and remanded.*

Mr. JUSTICE MUSSER and Mr. JUSTICE GABBERT concur.